FRED MACMURRAY, ET. AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 35201, 35202, 35203, 37394, 37395, 40290, 40291, 40292. Promulgated October 9, 1953.

---

[1] Lillian MacMurray, Docket No. 35202; Leslie Fenton, Docket No. 35203; Frederick M. MacMurray, Docket No. 37394; Lillian MacMurray, Docket No. 37395; Fred MacMurray, Docket No. 40290; Lillian MacMurray, Docket No. 40291; Frederick MacMurray and Lillian MacMurray, Docket No. 40292. Lillian MacMurray died after the trial and "Estate of Lillian Wehmhoener MacMurray, Deceased, Bo C. Roos, Executor" was substituted as a party in Nos. 35202, 37395, 40291, and 40292. However, for convenience, Lillian MacMurray will be referred to herein as petitioner in those cases.

*James L. Wood, Esq.*, and *Joseph D. Brady, Esq.*, for the petitioners.
*Donald P. Chehock, Esq.*, for the respondent.

RAUM, *Judge:* The respondent determined the following deficiencies
in income tax:

| Year | Taxpayer | Docket No. | Deficiency |
|------|----------|-----------|-----------|
| 1944 | Fred MacMurray [1] | 40290 | $33, 376. 39 |
| 1944 | Lillian MacMurray | 40291 | 33, 376. 39 |
| 1945 | Fred MacMurray | 40290 | 16, 173. 67 |
| 1945 | Lillian MacMurray | 40291 | 16, 173. 67 |
| 1946 | Fred MacMurray | 35201 | 33, 313. 76 |
| 1946 | Lillian MacMurray | 35202 | 33, 313. 75 |
| 1946 | Leslie Fenton | 35203 | 18, 501. 89 |
| 1947 | Frederick M. MacMurray [1] | 37394 | 10, 668. 47 |
| 1947 | Lillian MacMurray | 37395 | 10, 668. 45 |
| 1948 | Frederick M. MacMurray | 37394 | 2, 904. 87 |
| 1948 | Lillian MacMurray | 37395 | 2, 904. 86 |
| 1949 | Frederick [1] and Lillian MacMurray | 40292 | 27, 898. 94 |

[1] "Frederick M.," "Frederick," and "Fred" MacMurray are the same petitioner.

The issues are:

(1) When a business operated by a marital community in Cali-
fornia sustains losses for 5 consecutive years, does the $50,000 limita-
tion provided for in section 130 of the Internal Revenue Code apply
to the total loss sustained in each year by the community or to the
share of such loss of each member of the community?

(2) Did the $64,000 and $31,000 received by petitioners Fred Mac-
Murray and Leslie Fenton, respectively, in 1946, from the producers-
distributors of the movie, "Pardon My Past," constitute ordinary in-
come or capital gain to the petitioners? If the latter, was it short-term
or long-term capital gain?

Certain issues raised by the pleadings have been waived by stipu-
lation. Other adjustments in the notices of deficiency were not con-
tested in the petitions.

*Issue 1.*

FINDINGS OF FACT.

The stipulated facts are found accordingly.

Fred and Lillian MacMurray were married in 1936, and thereafter resided in California. They filed their income tax returns for the taxable years with the collector of internal revenue for the sixth district of California. The returns filed by them for each of the taxable years were separate returns, with the exception of 1949, when they filed a joint return.

Since her marriage, Lillian MacMurray, a housewife, was not gainfully employed, and did not have any separate income of her own.

Fred MacMurray has been a "star" in the motion pictures since 1934. During the years 1942 to 1949, inclusive, his net income from this source averaged approximately $250,000 a year.

During the years 1942 to 1949, inclusive, the MacMurrays owned as community property ranch properties acquired after their marriage in 1936. These properties were acquired with money earned by Fred MacMurray in his motion picture work. The income, expenses, and losses from these ranch operations during this period constituted community income, expenses, and losses of the spouses. The ranch operations constituted a business, which was carried on by Fred MacMurray, with most of the detail of management left to a business manager.

In the two years 1942 and 1943, the MacMurrays incurred total losses from the operation of the ranches (exclusive of interest and taxes) of $64,981.22 and $84,545.03, respectively. For these years, all income, expenses, and ranch losses of the community were reported in the returns of Fred MacMurray alone, with one-half of the losses from these operations deducted in the individual returns of each spouse. For the years 1944 to 1948, inclusive, all income, expenses, and ranch losses of the community were reported in the returns filed by each spouse, and each deducted one-half of the losses sustained. All income, expenses, and ranch losses of the community for 1949 were reported in a joint return filed by both spouses.

During each of the taxable years 1944 to 1949, inclusive, substantial losses were sustained from the operation of the ranch properties. The deductions (other than taxes and interest) allowable to petitioners under section 23 of the Internal Revenue Code (except for the provisions of section 130), and attributable to ranch operations, exceeded the gross income derived from such operations in the following amounts:

| Year | Excess of deductions over gross income | Year | Excess of deductions over gross income |
|------|------|------|------|
| 1944 | $127, 916. 43 | 1947 | $68, 155. 80 |
| 1945 | 97, 880. 66 | 1948 | 61, 146. 19 |
| 1946 | 61, 595. 90 | 1949 | 89, 192. 20 |

The respondent determined that the $50,000 limitation on losses, provided for in section 130 of the Internal Revenue Code, should be applied to the net losses sustained by the community in each year from ranch operations, and disallowed as deductions in each of the taxable years the amount by which the net loss of the community from such operations (after deducting interest and taxes) exceeded $50,000. Thus, the deductible share of each spouse of such net losses sustained by the marital community from ranch operations in each taxable year was limited to $25,000.

OPINION.

Section 130 of the Internal Revenue Code [2] places a limitation on the deductions (other than taxes and interest) "allowable to an individual * * * and attributable to a trade or business carried on by him," where such deductions for each of 5 successive taxable years have exceeded by more than $50,000 the gross income derived from such trade or business. In such circumstances the statute provides that the net income of "such individual" shall be recomputed and that such deductions shall be allowed only to the extent of $50,000 plus the gross income attributable to such trade or business.

Since the ranch properties constituted community property of the two MacMurrays in California (acquired after 1927), the spouses accounted tax-wise for the operation of these properties by allocating one-half of the profits or losses to each of them, as they were plainly entitled to do in accordance with prior judicial decision and established practice. *United States* v. *Malcolm*, 282 U. S. 792; *Poe* v. *Seaborn*, 282 U. S. 101; *Stewart* v. *Commissioner*, 95 F. 2d 821, 822 (C. A. 5), affirming 35 B. T. A. 406, 410; *Alice G. K. Kleberg*, 43 B. T. A. 277, 295; G. C. M. 19727, 1938–1 C. B. 255; O. D. 909, 4 C. B. 254. Cf. *Elvina Ratto*, 20 T. C. 785.

The provisions of section 130 can be applicable here only if the deductions of both spouses are blended together, for the ranch losses of each spouse for any 5-consecutive-year period under consideration were not sufficient to bring section 130 into play. Petitioners argue that the deductions of the spouses cannot be treated as a unit, and point to the language of the statute, which speaks of deductions "allowable to an individual * * * and attributable to a trade or busi-

---

[2] SEC. 130. LIMITATION ON DEDUCTIONS ALLOWABLE TO INDIVIDUALS IN CERTAIN CASES.

(a) RECOMPUTATION OF NET INCOME.—If the deductions (other than taxes and interest) allowable to an individual (except for the provisions of this section) and attributable to a trade or business carried on by him for five consecutive taxable years have, in each of such years, exceeded by more than $50,000 the gross income derived from such trade or business, the net income of such individual for each of such years shall be recomputed. For the purpose of such recomputation in the case of any such taxable year, such deductions shall be allowed only to the extent of $50,000 plus the gross income attributable to such trade or business, except that the net operating loss deduction to the extent attributable to such trade or business shall not be allowed.

ness carried on by him." We think that petitioners must prevail on this issue. Here, the ranch deductions "allowable" to Fred MacMurray simply did not meet the statutory requirement.

We have examined the legislative history of section 130, and find nothing which throws light upon the point in issue. See S. Rept. No. 627, 78th Cong., 1st Sess., pp. 27, 61–62; H. Rept. No. 1079, 78th Cong., 2d Sess., pp. 56–57; 90 Cong. Rec., Part 1, pp. 223–233, 1352–1353. It is clear from this history, as respondent argues, that the Congress was concerned with losses of "individuals" as opposed to losses of corporations. But there is nothing in the history to justify rejecting the plain language of the statute. Certainly, if Fred MacMurray had operated the ranch properties in partnership with some third person, his share of the losses of the enterprise would be the determinative criterion in the application of section 130 to the computation of his net income. So much has already been unambiguously stated in a recent ruling.[3]

The statute speaks of the losses "allowable to an individual," and we are not at liberty to rewrite it for citizens of community property states. It may well be that if the attention of Congress had been drawn to the discriminatory operation of the statute in such states, it might have treated the problem differently. The question, however, is a legislative one, and we must apply the statute as we find it. On this issue, our decision must be in favor of the petitioners.

### Issue 2.

#### FINDINGS OF FACT.

*General; the Purchase of "Pardon My Past."*—Leslie Fenton, the petitioner in Docket No. 35203, is a producer and director of motion pictures. He was an actor from 1922 to 1936, when he became a director, and has been a producer and director since 1943. He is a resident of Beverly Hills, California, and filed his income tax return for the year 1946 with the collector of internal revenue at Los Angeles, California.

Creighton J. Tevlin is a motion picture executive. His experience in the motion picture industry covers a period of at least 25 years, and includes experience as an independent accountant representing independent motion picture producers. During the years 1944, 1945, and 1946, he was president of General Service Corporation, Los Angeles, a corporation which rented studio facilities to independent producers.

---

[3] Rev. Rul. 155, Internal Revenue Bulletin, Aug. 17, 1953, in ruling that section 130 is applicable to a trade or business carried on as a partnership, provided that:

"it is further held that such section should be applied to a business of an individual operated in partnership form only where the individual partner's distributive share of a partnership loss is in excess of $50,000, exclusive of interest and taxes."

In 1944, MacMurray and Fenton, on encouragement by Tevlin, planned to form an independent motion picture producing corporation. Tevlin agreed to handle the management or business end of the project.

Some time prior to August 26, 1944, Fenton located a story called "Pardon My Past," and MacMurray, Fenton, and Tevlin, all being enthusiastic about it, agreed to attempt to acquire it and to use it as the basis of the first motion picture to be produced by the proposed corporation.

"Pardon My Past" was written by Patterson McNutt, in collaboration with Harlan Ware. On August 8, 1944, Harlan Ware quitclaimed his interest in this story to Patterson McNutt.

Negotiations with McNutt to purchase the story were carried on by Fenton on his own behalf and on behalf of MacMurray and Tevlin. Acting in that capacity Fenton purchased the story from McNutt. The purchase was evidenced by a written agreement, dated August 26, 1944, executed by McNutt and Fenton. Under that agreement the purchasers acquired "any and all rights in and to said story without limitation," including, but not limited to "motion picture screen rights, television rights, dramatic rights, publishing rights in book, serial or magazine form, and each and every other form of commercial exploitation usually and customarily employed in connection with story and literary matter." The price set forth in the agreement was as follows:

1. Upon commencement of photography of a contemplated motion picture based upon such story, "PARDON MY PAST," the sum of $25,000.00, it being understood and agreed that the commencement of such motion picture photoplay will be not later than March 1, 1945, unless your consent in writing has been received, allowing a later commencement date of said motion picture photoplay.

2. The sum of $25,000.00 which will be in addition to the amount set forth in No. 1 above and to be paid to you from the receipts of the contemplated motion picture photoplay in the following manner:

(a) Such $25,000.00 will be included in the budget as an item of cost and its payment to you deferred.

(b) The distributor will be advised and instructed to pay such amount to you from the producer's share of the gross receipts realized from the distribution of the contemplated motion picture, such payment to you, however, to be subordinate to the liens of record resulting from the financing of the motion picture such as the bank, lab, etc., and such amount to be paid to you simultaneous with the payment to the producer of his fee of $25,000.00 which will be similarly deferred.

MacMurray, Fenton, and Tevlin then entered into a written agreement dated August 28, 1944, setting forth that Fenton had acted as agent in the purchase; defining ownership rights of the parties in the story as MacMurray, 64 per cent, Fenton, 31 per cent, and Tevlin, 5 per cent; and stating that the parties assumed the obligations to pay the purchase price in those same proportions.

The story "Pardon My Past" was in "completed screenplay form" at the time of purchase; was an original story; was written as a motion picture screenplay; was unpublished and uncopyrighted; and was typewritten, in manuscript form.

At and soon after the time of its purchase, the intention of the purchasers was to sell the story at cost to the corporation to be organized, if events made it possible for the corporation to produce the picture. At no time did MacMurray and Fenton intend to keep the story for themselves. At all times they held the story for sale—the potential purchaser being their own company, or some other producing company. From the time of the acquisition of the story, it was contemplated MacMurray would be the star and Fenton the director of the movie to be produced.

The purchase of the story from McNutt was an arm's-length transaction. Tevlin and Fenton both were of the opinion that $50,000 was a bargain price for the story.

The agreements dated August 26, 1944, and August 28, 1944, were (as expressly contemplated therein) rewritten and formalized into a form more satisfactory to the bank which was to finance the motion picture, on or about March 20, 1945, in written agreements between McNutt, owner, and MacMurray, Fenton, and Tevlin, purchasers. One of those formalizing agreements recited that "the parties are desirous of more particularly defining their rights and obligations with respect to the [prior] sale of the 'Property,'" after referring to the purchase agreement dated August 26, 1944.

The purchase agreement dated August 26, 1944, was executed by Fenton and McNutt in McNutt's house on August 26, 1944. The agreement dated August 28, 1944, was executed on August 28, 1944.

On August 26, 1944, Fenton handed to McNutt a cashier's check in the amount of $2,500 dated August 26, 1944, which was cashed by McNutt on September 1, 1944, as a payment on account of the purchase price of the story to "close the deal." The funds to acquire the cashier's check were furnished by Tevlin.

*Formation of Mutual.*—Originally a group composed of actors Fred MacMurray and John Wayne, director Frank Borzage, and producer-director Leslie Fenton planned to form the independent producing corporation. A pre-incorporation agreement was drafted on or about September 11, 1944, for execution by MacMurray, Wayne, and Fenton. Borzage had left the group, and for an undisclosed reason Wayne also dropped out thereafter. That agreement, after being modified so as to state that it was to have the same effect as if Wayne were not mentioned, and that MacMurray and Fenton were to have the right to subscribe to 66⅔ per cent and 33⅓ per cent of the shares, respectively, was executed on or about September 19, 1944, by MacMurray and Fenton.

That agreement, pursuant to which Mutual Productions, also known as Mutual Productions, Inc., was formed, set forth that MacMurray agreed to enter into an employment contract with the corporation, at the same compensation as his then established rate at Twentieth Century-Fox Film Corporation, or at such higher rate as the corporation and MacMurray agreed upon, subject to governmental approval; and stated that the story "Pardon My Past" was approved as the basis of the first contemplated production in which he would render services as star. Fenton agreed, in the same contract, to render services to the proposed corporation as producer-director of the first four productions, at compensation of $60,000 per picture, or at such higher rate as he and the corporation agreed upon, subject to governmental approval.

Mutual Productions (hereinafter referred to as Mutual) was incorporated in California on October 7, 1944. The officers of the corporation were Leslie Fenton, president; Fred MacMurray, vice president; and C. J. Tevlin, secretary and treasurer; and the board of directors was composed of those three. MacMurray owned 66⅔ per cent of its stock, and Fenton 33⅓ per cent. Neither MacMurray nor Fenton ever received any compensation for services rendered as officers of Mutual.

*Twentieth Century-Fox.*—Soon after forming the corporation Tevlin, representing Mutual, began to make arrangements to have the corporation produce the motion picture "Pardon My Past." The tentative agreement of Twentieth Century-Fox Film Corporation (hereinafter referred to as Fox) was obtained to enter into a distribution agreement under which Fox would release and distribute the picture to the public in return for a certain percentage of gross receipts as its fee. Fox was to act only as distributor, under a license agreement, and was not to share in any of the profits which Mutual expected to realize from the production and distribution, through Fox, of the motion picture.

Mutual also made tentative arrangements to finance the production. The primary financing was to be a bank loan from Security-First National Bank of Los Angeles and Bankers Trust Company of New York, and the secondary financing was to be a loan from Tower Associates and deferments (that is, by payment out of gross-receipts rather than during production) of the salaries of MacMurray and Fenton and $25,000 of the story cost.

It was contemplated that MacMurray would receive $150,000 from Mutual for his services as star, and Fenton $60,000 as producer-director, subject to approval of the Salary Stabilization Unit.

The owners planned to sell the story "Pardon My Past" to Mutual at cost, that is, in consideration of the assumption of the obligations to pay the purchase price of $50,000.

It was also part of the arrangement to have Mutual rent part of the studio facilities of Fox for the production of the motion picture, at cost plus an overhead charge.

The original basis of the deal was that Fox would furnish raw stock film. During that time there were wartime restrictions on the use of both negative and positive raw stock film, which was being allotted by the War Production Board only to major studios and to independent producers who had previously produced motion pictures.

The Fox deal was never carried out, however, because, upon reappraisal of its own situation, Fox refused to supply raw stock film to Mutual for "Pardon My Past."

Mutual made efforts early in November and December of 1944 to obtain an allotment of raw stock film for itself for the Fox deal. Those efforts failed.

*Secondary Financing from Tower.*—On December 5, 1944, Mutual entered into a loan agreement with Tower Associates under which Tower agreed to lend $100,000 as secondary financing, of which $25,000 was to be advanced to cover preproduction expenses, with $25,000 to be personally guaranteed by MacMurray and Fenton; and, in the same agreement, Mutual requested an advance of $10,000 on account of preproduction expenses.

Using part of the funds borrowed from Tower, Mutual paid $2,500 to McNutt on December 8, 1944, as another payment on account of the purchase price of the story at the request of McNutt. This payment was an advance or accommodation to McNutt, and was made by the corporation instead of by the individual owners of the story because it was felt at that time that the picture would be made by the corporation and it would end up paying, as story cost, whatever would be due to McNutt.

On March 20, 1945, McNutt confirmed in a formalizing agreement, heretofore mentioned, that he sold the story on August 26, 1944, to MacMurray, Fenton, and Tevlin, and, in the amendment to that formalizing agreement, entered into on March 20, 1945, McNutt acknowledged prior receipt of $5,000 on account of the purchase price of the story. That $5,000 consisted of the $2,500 paid to him on August 26, 1944, and the $2,500 paid to him on December 8, 1944.

On December 8, 1944, Mutual also paid $2,500 to C. J. Tevlin out of the Tower preproduction loan.

*United Artists.*—After the failure of the proposed deal with Fox, Tevlin approached United Artists. United Artists encouraged Mutual to believe that raw stock film could be allocated to Mutual.

The proposed United Artists deal was similar to the Fox deal, except that production facilities were to be rented from General Service Corporation, rather than from the distributor. On January

24, 1945, Mutual entered into a contract with General Service Corporation for the rental of production facilities.

As in the case of the proposed Fox deal, United Artists would get only its fees as distributor; Mutual would receive 100 per cent of the profits from the production and distribution of the film; and Mutual, the owner, would be restored to 100 per cent ownership after the 7-year licensing to United Artists for distribution purposes.

The United Artists deal was never consummated because neither United Artists nor Mutual could prevail upon the War Production Board to allot raw stock film for "Pardon My Past." The final telegram making it clear that no raw stock film was obtainable through United Artists was sent on February 19, 1945.

*S. S. U. Application.*—On January 18, 1945, during the time when Mutual was working on its proposed deal with United Artists, Mutual made applications to the Salary Stabilization Unit, Bureau of Internal Revenue, for approval of compensation for MacMurray of $175,000 as star in "Pardon My Past," and of compensation for Fenton of $60,000 ($30,000 as producer and $30,000 as director) as producer-director of "Pardon My Past," the entire salaries to be deferred. In both applications representation was made by Mutual that it had already acquired the picture rights of the story. This representation was made on the assumption that the proposed Fox deal would finally be consummated.

On January 24, 1945, the Salary Stabilization Unit approved $125,000 compensation for MacMurray and $50,000 compensation for Fenton ($25,000 as producer and $25,000 as director).

*RKO Studios.*—Shortly after the receipt of the telegram of February 19, 1945, indicating that no film was obtainable through United Artists, Tevlin made an appointment with the head of RKO Studios, another major producer and distributor. RKO would not consider a deal because it needed all the film that had been allotted to it.

*Columbia Pictures Corporation.*—Mutual was then in a hazardous position, having spent much of the money which it had borrowed from Tower Associates. There was one company remaining with which Mutual might make a deal, namely, Columbia Pictures Corporation, and Tevlin "as quickly as possible" contacted that corporation, which is a major producer and distributor of motion pictures.

No shares of Columbia stock were owned in 1944, 1945, or 1946 by Tevlin, MacMurray, or Fenton, and they were not employed by Columbia during those years.

Tevlin represented Mutual in its dealings with Columbia, and Tevlin acted on his own behalf as well as on behalf of MacMurray and Fenton in dealing with Columbia and Mutual with regard to the sale of the story.

B. B. Kahane was, in 1944, 1945, and 1946, and still is, the executive vice president of Columbia, having general charge of production at the studio with major executive and administrative duties. He has been a major executive with various motion picture industry companies since 1920, and was president of RKO from 1932 to 1936, when he became vice president of Columbia.

The first contact by Tevlin, acting for Mutual, was made with Kahane. Kahane had the responsibility of passing on the deal for Columbia, and outlined the terms under which Columbia would participate. The only other representatives of Columbia with whom Tevlin dealt were Leonard Picker, an executive at Columbia who assisted Kahane, and C. E. Erkel, attorney for Columbia.

Kahane told Tevlin that Columbia would not take the picture on a distribution basis, but that if the script was "right," and if the cost at which the picture could be made was sound, Columbia would be willing to make a partnership deal under which it would act as distributor, supply the secondary financing, and receive 50 per cent of the profits from the picture. The payment of 50 per cent of the profits to Columbia was to be in addition to the fees that Columbia would receive as distributor and in addition to the interest and other possible charges that it would also receive by reason of supplying the secondary financing. Tevlin thought this was "a very disadvantageous deal" since Mutual had already arranged the primary (bank) financing and was not going to use the production facilities of Columbia. At the beginning of the negotiations he insisted that, as a part of the deal, the story would have to be acquired at a cost of $150,000. which, in his opinion, represented its fair market value.

The interested parties entered into three written agreements—the production-distribution agreement between Columbia and Mutual dated March 1, 1945, a part of which was the budget for the picture; the story sale agreement between MacMurray-Fenton-Tevlin, as "owners," and Columbia and Mutual, as "purchasers," dated March 24, 1945; and the license agreement between Columbia and Mutual dated March 26, 1945. Kahane signed these agreements on behalf of Columbia. These agreements are hereby incorporated in these findings by reference.

The production-distribution agreement dated March 1, 1945, provided generally that Mutual was to furnish the star, director, business manager, studio facilities, and other facilities (except laboratory work), and produce a motion picture based upon a story entitled "Pardon My Past"; that Columbia was to distribute the picture to the public for which it would receive the usual distributor's fees, 25 per cent of receipts from United States, 30 per cent from England and a few other countries, and 40 per cent from the remaining countries in the world; that the picture would be produced at the studio

of General Service Corporation; that MacMurray would be the star at a budgeted salary of $125,000; that Fenton would be producer-director at a budgeted salary of $50,000; that the budget would be limited to $800,000; that the $800,000 would be financed 70 per cent or $560,000 by a bank loan; 15 per cent or $120,000 by loans and credits from Columbia; and 15 percent or $120,000 by Mutual through deferment of $70,000 of MacMurray's $125,000 salary, $25,000 of Fenton's $50,000 salary, and $25,000 of the $50,000 obligations to McNutt for the story. Articles IV and V of the agreement provided as follows:

### IV.

Negative Cost.

The term "negative cost" or "production cost" as used herein shall be deemed to be the entire actual cost of the production of said picture. No expenditures or obligations of any nature shall be made or incurred by you in the production of said picture and charged to its negative cost unless included in the budget for said picture as approved by us or otherwise consented to by us in writing.

Certain items that will make up a portion of the negative cost of the picture, the costs of which have been agreed upon are as follows, and no further sums for such items shall be included in the "negative cost" or "production cost":

(1) One Hundred and Twenty-Five Thousand Dollars ($125,000) for the services of Fred MacMurray.

(2) Fifty Thousand Dollars ($50,000) for the services of Leslie Fenton.

(3) Fifty Thousand Dollars ($50,000) on account of the acquisition from Patterson McNutt of rights to the story "Pardon My Past".

Although the above items are a part of the negative cost of the picture, only a portion of said items shall be paid out of funds available for the making of the picture. The amounts which shall be paid out of funds available for making the picture are as follows:

(a) Fred MacMurray and Leslie Fenton shall receive out of the funds available for the making of the picture the total sum of Eighty Thousand Dollars ($80,000.00).

(b) Twenty-Five Thousand Dollars ($25,000) shall be paid to Patterson McNutt out of the funds available for making the picture.

The balance of said moneys which are a part of the negative cost of the picture but are not to be paid out of funds available for making the picture are to be deferred and are to be paid as hereinafter in Article XI provided.

### V.

Budget.

It is agreed that the maximum cost of the picture to be produced hereunder shall not exceed Eight Hundred Thousand Dollars ($800,000), unless a higher budget therefor is approved by us in writing. A budget for said picture has been prepared, a copy of which is attached hereto and marked Exhibit "A", and said budget is hereby approved.

The budget included 24 items totaling $800,181. Among these items were $50,000 for the story, $276,921 for players, $25,000 for producer, and $25,000 for director. The $50,000 for the story includes both the $25,000 payable to McNutt upon the first photography and also the $25,000 deferred until other costs of production were paid.

The $276,921 for players includes MacMurray's salary of $125,000, $55,000 of which was payable when the services were rendered, and $70,000 deferred until other costs were paid. The $25,000 for producer and the $25,000 for director were both listed for Leslie Fenton.

Article XI of the agreement provided that the gross receipts from the distribution of the film should be applied to various claims, such as taxes, distribution fees, bank loan, and Columbia's loans, then to deferred items, then to Columbia in an amount equal to 25 per cent of all moneys advanced by Columbia as its "Percentage Reimbursement" (a further fee required by Columbia in connection with its loan and participation in the deal), then to story purchase moneys,[4] and finally, the balance of the receipts, designated the "net proceeds" of the picture, were to be divided 50–50 between Columbia and Mutual.

In article XXIX Columbia agreed to furnish the raw stock film required by Mutual in the making of the picture.

It is not unusual in production-distribution agreements entered into by Columbia to have the price paid for the story split, and to have part of it paid out of receipts in a lower order of priority.

The production-distribution agreement dated March 1, 1945, was executed by the parties some time between March 8 and March 17, 1945.

The story sale agreement bearing date of March 24, 1945, between MacMurray, Fenton, and Tevlin, as "owners," and Columbia and Mutual, as "purchasers," after reciting, among other things, that the owners had acquired the story from Patterson McNutt for $50,000, payable $25,000 upon the commencement of photography and $25,000 deferred and payable out of gross receipts, that McNutt had received $5,000 of the purchase price, leaving a balance of $20,000 to be paid upon commencement of photography, and that the March 1, 1945, production-distribution agreement had been entered into between Columbia and Mutual, provided as follows:

1. Owners do hereby grant, bargain, sell, assign and transfer unto Purchasers all of their right, title and interest in and to the original story, hereinabove referred to and known as "PARDON MY PAST" and in and to the screen play which has been written and based upon said original story * * *.

2. It is expressly understood and agreed that Owners hereby represent and warrant that they have in no way conveyed, granted, bargained, sold, assigned or hypothecated any rights of any kind or character in and to the instruments or the literary property covered thereby, or any part or portion thereof to any person, firm or corporation.

---

[4] Paragraph 12 of article XI, relating to story purchase moneys, provided:

"Thereafter, * * * the remainder * * * shall be paid to Mr. MacMurray, Mr. Fenton and Mr. Tevlin, until such time as they have received the sum of * * * $100,000 * * * to complete the payment of the balance of the purchase price of the story upon which the photoplay is to be based, in accordance with the purchase agreement between Mr. MacMurray, Mr. Fenton and Mr. Tevlin, as owners, and you and us, as purchasers. Said moneys shall be paid to said parties in the following percentages: Sixty-four per cent (64%) thereof to Mr. MacMurray; thirty-one per cent (31%) thereof to Mr. Fenton and five per cent (5%) thereof to Mr. Tevlin."

3. Purchasers do hereby assume Owners' obligation to pay Patterson McNutt the balance of the Fifty Thousand ($50,000.00) payment to be made to him under the terms and provisions of Article Seventh of the Agreement dated the 20th day of March, 1945, between Patterson McNutt and Owners as purchaser. Purchasers shall have no personal liability for the payment of the Twenty-Five Thousand Dollars ($25,000.00) described in subparagraph B of Article Seventh of said agreement. Said sum shall be payable only out of the proceeds of the picture to be based upon the story "PARDON MY PAST" in accordance with the terms and provisions of Article XI of the Production-Distribution Agreement.

4. Purchasers hereby agree to pay Owners in the manner provided in paragraph 12 of Article XI of the Production-Distribution Agreement payable only out of the proceeds of said picture the sum of One Hundred Thousand Dollars ($100,000.00). Purchasers shall have no personal liability as to the payment of said One Hundred Thousand Dollars ($100,000.00) and the rights of Owners shall be limited to receiving said One Hundred Thousand Dollars ($100,000.00) out of the proceeds of said picture as provided in the Production-Distribution Agreement and personal liability is waived by Owners.

Under date of March 26, 1945, an agreement (referred to as the "license agreement") was entered into between Columbia and Mutual. Therein, in paragraph 1 Columbia and Mutual assigned to Mutual, subject to the terms of the production-distribution agreement, the right to make one motion picture photoplay to be based upon the story "Pardon My Past." In paragraph 2 Columbia and Mutual warranted that they had made no assignment of any rights in the story to any person, firm, or corporation. In paragraph 3 Mutual assumed the obligation of Columbia and Mutual to pay McNutt the balance of the $50,000 payment ($45,000) under the agreement of March 20, 1945, it being agreed that $25,000 of this balance was payable out of the proceeds of the picture as provided in article XI of the production-distribution agreement. In paragraph 4, the parties agreed that the $100,000 payable to MacMurray, Fenton, and Tevlin under the story sale agreement, should be payable out of the proceeds of the one picture to be made by Mutual in the manner provided in paragraph 12 of article XI of the production-distribution agreement, that Mutual and Columbia should have no personal liability as to the payment of the $100,000, and that the rights of MacMurray, Fenton, and Tevlin to receive this payment should be limited to payment out of the proceeds of the picture.

The story sale agreement dated March 24, 1945, and the license agreement dated March 26, 1945, were executed by the parties some time between April 2, 1945, and April 8, 1945.

On April 4, 1945, Mutual borrowed $560,000, equal to 70 per cent of the $800,000 budget, from Security-First National Bank of Los Angeles and Bankers Trust Company of New York; and these two banks and Mutual and Columbia executed the necessary loan documents.

Mutual entered into undated employment agreements with Mac-Murray and Fenton calling for MacMurray's services as star in "Pardon My Past" for $125,000, of which $70,000 was deferred, and Fenton's services as producer-director of this picture for $50,000, of which $25,000 was deferred.

On April 9, 1945, Mutual entered into a formal agreement with General Service Corporation under which the facilities of that studio were rented to Mutual for the production of "Pardon My Past." Production of the picture was completed in 1945. It took approximately 6 weeks to complete the principal photography.

Since Columbia supplied the secondary financing, there was no need to go forward with the Tower agreement, and Tower Associates agreed to accept repayment of the funds they had advanced; the loan agreement with them was canceled.

In 1946, Columbia and Mutual received $1,000 for the use of the story in a radio broadcast. As coowners of the residual rights to the story Columbia and Mutual each received one-half of this fee.

The Form 1120 corporation tax return of Mutual for the fiscal year ended September 30, 1945, reported net income of $7,889.77. Attached to the return is a "Summary of Detail Budget and Cost Report" for the production of "Pardon My Past," showing all costs up to September 30, 1945. This summary shows that production started April 27, 1945, finished June 12, 1945. Included in the total costs of $685,138.60 listed in the summary is an item "Story, $50,250.00."

The corporation tax return of Mutual for the fiscal year ended September 30, 1946, shows gross revenue from distribution of the picture of $1,186,941.73 before deducting the 50 per cent net profits retained by Columbia which amounted to $93,465.49. The cost of producing the picture as reported in a schedule attached to this return amounted to $789,644.65, including an item for "Story $150,250.00." This 1946 return reports net income of $82,833.41. The return of Mutual for the year ended September 30, 1947, shows net income of $76,076.67, and for the year ended September 30, 1948, net income of $23,150.26.

Mutual was dissolved on March 10, 1948.

After distribution costs, Columbia retained for its 50 per cent net, $93,465.49 for the year ended September 30, 1946, and $59,797.18 for the year ended September 30, 1947, or a total for 2 years of $153,262.67.

After release of the motion picture "Pardon My Past," Columbia applied the receipts in payment of obligations in the order of their priority under the production-distribution agreement. During the year 1946, MacMurray received $64,000, Fenton $31,000, and Tevlin $5,000, being their respective shares of the $100,000 payment provided for in article XI, paragraph 12, of the production-distribution agreement dated March 1, 1945.

In the separate Federal income tax returns filed by Fred Mac-Murray and his wife for the year 1946, each reported one-half of the gain from the sale of their 64 per cent interest in the story "Pardon My Past," as a long-term capital gain, as follows:

```
Cost—date acquired 8/26/44_____ $32,000
Sales price _____   96,000
                                                         --------
Gain_____   $64,000
Community property one-half_____   32,000
```

In the Federal income tax return filed by Leslie Fenton for the year 1946, he reported, as a long-term capital gain, the gain from the sale of his 31 per cent interest in the story, as follows:

```
Cost—date acquired 8/26/44_____ $15,500
Sales price _____   46,500
                                                         --------
                                                         $31,000
```

The respondent in his deficiency notices determined that the gain reported by the MacMurrays and Fenton constituted "ordinary income under the provisions of Section 22 of the Internal Revenue Code."

Neither Fred MacMurray, nor Lillian MacMurray, nor Fenton has ever engaged in the business of buying and selling stories.

The gains of $64,000 and $31,000 realized by the MacMurrays and Fenton, respectively, in 1946, were gains from the sale of their interests in "Pardon My Past." Their interests were capital assets, and were held for more than 6 months.

### OPINION.

The respondent contends that the respective interests of petitioners in the story "Pardon My Past" were not capital assets; that if they were, petitioners have not established that such interests were held by them for more than 6 months; that gain, if any, realized from the sale of the story would therefore be a short-term capital gain; and that the payments of $64,000 to the MacMurrays and $31,000 to Fenton in 1946 did not represent gain from that sale but were in the nature of dividend income or compensation for services, and taxable as ordinary income.

Section 117 (a) (1) of the Internal Revenue Code, in so far as here pertinent, defines the term "capital assets" to mean property held by a taxpayer (whether or not connected with his trade or business), but not to include property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. The respondent urges that the story was acquired and held by petitioners MacMurray and Fenton for sale to a corporation that would produce a motion picture based on it, and employ MacMurray as the star in the picture and Fenton as the director-producer; that MacMurray's ordinary course of trade was that of an actor, and Fenton's was that of

a director-producer; that the story was acquired and held for sale to a customer that would further MacMurray and Fenton in the ordinary course of their respective trades; and that it, therefore, constitutes "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" and is not a capital asset. We do not agree. The quoted provision does not exclude from the term "capital assets" property purchased with the objective of furthering, or aiding the purchasers in the trade or business engaged in by them. It excludes "property held by a taxpayer for sale to customers in the ordinary course of his trade or business." An actor or a producer-director does not in the ordinary course of his trade or business hold property primarily for sale to customers. He may, however, engage in another business involving the purchase and sale for profit of property, such as stories for motion pictures. There was testimony that Fenton purchased one story other than "Pardon My Past" and MacMurray two, one of which he still owns. These isolated transactions do not constitute a business. "Pardon My Past" was not, therefore, property held by petitioners for sale to customers in the ordinary course of any trade or business carried on by them, and qualifies as a "capital asset" under the definition of that term contained in section 117 (a) (1).

We are unable to agree with the respondent's contention that the petitioners did not establish that they retained ownership of their interests in the story for more than 6 months. The agreement for its sale by them and Tevlin, as owners, and its purchase by Columbia and Mutual, as purchasers, dated March 24, 1945, was executed by the parties between April 2 and 8, 1945. Present words of conveyance were used therein, the "owners" warranted that they had in no way conveyed, sold, or assigned any rights of any kind in the story to any person, firm, or corporation, and no reference was made to any prior agreements. While it appears that there was an understanding at or prior to the time the production-distribution agreement was executed that the story would be sold to Columbia and Mutual, we are convinced that the sale was not consummated until the story sale agreement was executed. Inasmuch as that occurred subsequent to February 26, 1945, the story, which was purchased by petitioners and Tevlin on August 26, 1944, was held by them for more than 6 months. Any gain resulting from its sale would therefore constitute a long-term capital gain under the provisions of section 117 (a) (4) of the Internal Revenue Code.

There remains the respondent's contention that the $64,000 received by MacMurray and the $31,000 received by Fenton in 1946 should be taxed as ordinary income in the nature of a dividend or compensation for services, and not as capital gain. The respondent's argument in support of this contention may be stated, as follows: In determining

the nature of the $100,000 payment, the substance of the transaction, and not mere form, is controlling. Only $50,000 was included in the budget for the story and that is all Mutual and Columbia paid for it. The $100,000 payment and the 50–50 division, being last in the order of priority, came from profits, after all budgeted costs of production and distribution were paid. Neither Mutual nor Columbia assumed any personal obligation to make the $100,000 payment. Mutual's contribution to the venture greatly exceeded that of Columbia and it bargained for and was entitled to receive at least a $100,000 share of the net profits in excess of that received by Columbia. The $64,000 payment to the MacMurrays and the $31,000 payment to Fenton correspond (except for the $5,000 to Tevlin) with the 66⅔ per cent and 33⅓ per cent stock ownerships of these two individuals in Mutual. Based on the foregoing argument, respondent urges that his determination, that $95,000 of the $100,000 disbursement constituted earnings of Mutual and dividend income to petitioners, or, in the alternative, additional compensation, should be sustained.

The similarity between the proportionate interests of petitioners in the stock of Mutual and in the $100,000 payment requires that the transaction giving rise to that payment be given strict scrutiny to determine whether the form adopted in carrying out that transaction was intended to disguise the payment of a dividend or additional compensation for services. The petitioners and Tevlin and Kahane all testified at the trial. Counsel for petitioners and respondent questioned them at length with respect to the events leading up to the deal with Columbia, the sale of the story, why $50,000 of the sales price was included in the budget for the motion picture based on the story and $100,000 deferred, and the value of the story at the time it was sold to Columbia and Mutual.

From the testimony of these witnesses it is apparent that Columbia drove a hard bargain. Petitioners had to have film if the picture "Pardon My Past" was to be produced and Columbia insisted as a condition precedent to entering into any deal that it receive certain fees for distributing the picture, 6 per cent interest plus a bonus of 25 per cent on any moneys advanced by it, a 50 per cent interest in rights to the story other than motion picture rights, and a one-half interest in the profits. Tevlin, who handled the negotiations for Mutual, and for himself, MacMurray, and Fenton, felt that this deal was so disadvantageous compared with what they had contemplated, that they should insist "upon everything the traffic would bear with respect to the story." Every company that he had previously failed to make a deal with had "offered to take over these picture elements and to pay a substantial profit for the story," and he believed that the story had a value in excess of cost. He felt, therefore, that if there was to be a 50–50 partnership in which they would end up with

only half of the profits instead of all as they had originally planned, the story should be taken into the deal at its fair market value and not at what it cost them. He testified that he never questioned a story cost on a worthy project of 10 per cent of picture cost, but that if it got beyond 10 per cent he would look to see if the story had plus values that would justify a higher price. He added "plus" values to this story because he considered it unique in that it was suitable to one actor who was enthusiastic about it; practically the whole action took place on one set "depicting the interior of a home and the exterior of a street," thus assuring economical production at a time when it was difficult to get an allocation of building materials for use in a studio; and it was "ready to go," arrangements having been made for the actor to take the lead, the director-producer, the bank loan, and the facilities of General Service Corporation for the production of the picture.

After discussing the price to be asked for the story with MacMurray and Fenton and getting their approval to the sale of the property, he demanded that, as a part of the deal, the story would have to be acquired at a cost of $150,000, which was his opinion of its market value in the circumstances. Columbia accepted these terms. Tevlin stated that it was not unusual for a story to cost $150,000 where the budget was between $800,000 and $900,000, and that in asking for this amount he was not influenced by any feeling that MacMurray and Fenton were entitled to a bigger share of the profits and had no thoughts with respect to any share of profits belonging to them. He also stated that the purpose of not including $100,000 of the story cost in the budget was that such inclusion would have necessitated an additional advancement on the part of Columbia, pursuant to the secondary financing arrangements, on which Columbia would have received 6 per cent interest plus a 25 per cent bonus, and he wanted to avoid these additional charges.

Kahane, the vice president of Columbia, who handled the negotiations for that corporation, testified that Columbia was not concerned with what the story cost the petitioners and Tevlin, but with what in its judgment it was worth; that prices paid for other stories are not a proper basis for determining the price to be paid; that all elements of the deal are taken into consideration in reaching that determination; that the use to which the story can be put is a factor that affects its value and the price paid for it; and that in this deal they took into account that there was "a setup that was ready to go." He also testified that he did not suggest $150,000 for the story, but that Tevlin made it clear at the outset of the negotiations that as a part of the deal the story would have to be acquired at a cost of $150,000. He stated that $150,000 was not a "disproportionate percentage to pay for a story" to be included in a picture having an

$800,000 or $900,000 budget, and that this amount was intended to be just what the agreement says it is—the price for the story and script. He also stated that at the time Columbia acquires the rights to stories, it is not unusual to defer a portion of the purchase price, that is, to have the seller wait for part of it until a picture is released and there are receipts.

Paragraph 4 of the story sale agreement provides that the purchasers, Mutual and Columbia, agree to pay owners, MacMurray, Fenton, and Tevlin, $100,000, in the manner provided in paragraph 12 of article XI of the production-distribution agreement. Paragraph 12 of the latter agreement states that the $100,000 is to be paid out of gross receipts "to complete the payment of the balance of the purchase price of the story upon which the photoplay is to be based" and "in accordance with the purchase agreement between Mr. MacMurray, Mr. Fenton, Mr. Tevlin, as owners, and you and us as purchasers." The petitioners, and Tevlin and Kahane, testified that these provisions of the agreements reflected their intentions and understanding.

One further consideration calls for special mention, namely, that Tevlin owned no stock in Mutual. Yet the $100,000 in question was payable to MacMurray, Fenton, *and Tevlin* in proportion to their ownership of the story. Although the point is by no means conclusive, since Tevlin's interest in the story was a comparatively minor one, it nevertheless fortifies the conclusion that the payment was in fact what it appeared to be and was not a disguised dividend or additional compensation.

After a careful consideration of all of the evidence, we are convinced that the $100,000 was in fact consideration paid for the sale of the story "Pardon My Past." The proportionate part of this amount received by the petitioners in 1946 is, therefore, capital gain, and the respondent erred in treating it as ordinary income in the nature of a dividend or compensation for services.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

---

OPPER, *J.*, dissenting: In the face of complicated and intricate measures designed by Congress to equalize the tax burden of married couples in community and noncommunity property states, see H. Rept. No. 1274, 80th Cong., 2d Sess., p. 1; S. Rept. No. 1013, 80th Cong., 2d Sess., p. 1, we are arriving at a result which gives to community property taxpayers the benefit of a deduction unavailable to those residing in other sections of the country. As so often in the past, we are once more permitting formalistic terms of ancient property law to override the exigencies of a modern and uniform national tax system. E. g., *Estate of James F. Waters*, 3 T. C. 407; *William*

*Kirkman Gray*, 5 T. C. 290, revd. (C. A. 5) 159 F. 2d 834; *C. Clifford Minnick*, 14 T. C. 8.

Notwithstanding an absence of clear language in the statute, I cannot believe that it was the legislative intent to attain any such discriminatory result. In this respect I view the wording of the legislation and its history[1] as less noncommital than does the present opinion. The disallowance is of "deductions * * * attributable to a trade or business carried on by" the taxpayer. And it is stipulated that "The ranch operations constituted a business carried on by the petitioner Fred MacMurray * * *." Not only does the statute deal with deductions, as to which the rule is uniform that such matters depend on legislative grace and are to be strictly construed, *New Colonial Ice Co.* v. *Helvering*, 292 U. S. 435, but its purpose seems to require disallowance as not a business expense of the wife and as excessive with respect to the husband. See, e. g., *Lucas* v. *Earl*, 281 U. S. 111; *Helvering* v. *Clifford*, 309 U. S. 331; *Harold G. Parker*, 39 B. T. A. 423.

Since I would not so distort the plain and manifest Congressional purpose as to grant these petitioners a deduction neither intended nor consistent with the basic objective of the statute, see *Diamond A Cattle Co.*, 21 T. C. 1, I respectfully note my dissent.

[1] See 90 Cong. Rec., Part 1, pp. 223–233. Senator Danaher of Connecticut, who was in charge of the legislation, referred in the Senate debate on the measure to cases in which deductions had been allowed:

"In every single case which has gone to the courts * * * the Commissioner has lost simply for the reason that the Congress has never made it plain that its intention is to permit as legitimate deductions the cost of operating a business which has produced income."

He quoted with approval from the dissenting opinion of Member Lansdon of the Board of Tax Appeals in *George D. Widener*, 8 B. T. A. 651, concluding with the following:

"To permit these petitioners and others of their type to reduce their tax liability by the deductions of the costs of maintaining racing stables, expensive estates, and other similar activities, would result in a shifting of the burden of public taxation which it seems to me would be wholly inconsistent with the public interest. I am satisfied that these petitioners have not sustained the burden of proof necessary for us to find that the alleged losses were sustained during the taxable year in a business conducted for profit. I feel that the allowance of the deductions claimed would be contrary to the intent of Congress, detrimental to the public interest and a dangerous perversion of the sound and equitable principles upon which just taxation must rest."