Z. WAYNE GRIFFIN AND ELINOR W. GRIFFIN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 65139. Filed December 31, 1959.

*Stanley C. Anderson, Esq.*, for the petitioners.

*Donald P. Chehock, Esq.*, and *Cyrus A. Johnson, Esq.*, for the respondent.

FORRESTER, *Judge:* Respondent has determined a deficiency in the 1951 income tax of petitioners in the amount of $23,675.15. The sole issue remaining is whether respondent erred in determining that the gain realized on the sale of a certain story is taxable as ordinary income.

### FINDINGS OF FACT.

The stipulated facts are so found.

Petitioners, husband and wife, are residents of Los Angeles, California. Their joint income tax return for the calendar year 1951 was filed with the then collector of internal revenue at Los Angeles. Elinor W. Griffin is a party hereto solely by reason of the filing of a joint return, and Z. Wayne Griffin will hereinafter be referred to as the petitioner.

Petitioner was born in Hartford, Kentucky, in 1907, but moved shortly thereafter to California. Upon graduation from college in 1931, he was employed by a clothing firm as a salesman in Los Angeles.

After approximately 2 years petitioner was hired as an assistant producer by a radio network. He worked for various networks for 5 years, by the end of which time he had become a producer of radio shows. He then became manager of the west coast radio department of an advertising agency.

In early 1942 petitioner accepted a position with a talent agency as its radio director for the west coast and producer of all its radio shows broadcast from the west coast. This employment lasted 5 years, during which time petitioner produced several well-known radio shows.

Petitioner's father-in-law, a man of considerable wealth, suffered a heart attack in 1940 and died in 1949. Beginning in 1940 the burdens and responsibilities of managing his properties began to shift to petitioner.

In 1947 petitioner left the talent agency. He had by that time concluded that opportunities existed for the independent motion picture producer. However, the major studios did not then favor profit-sharing or participation arrangements, whereby the independent would produce the picture using studio facilities, unless the independent possessed a suitable script, an actor, and a director.

On December 26, 1946, petitioner purchased the story "Family Honeymoon" from its author for $28,433.05. He intended to form a corporation to produce a picture from this story, and engaged a writer to convert the story to a screenplay.

Petitioner failed in attempts to interest any well-known actor or actress and leading director, although he showed the script to about 30 such persons. He then took the script to John Beck, production assistant at Universal-International, Inc. (U–I). They agreed to coproduce the picture through a corporation they would form.

U–I rejected a participation arrangement, and on July 7, 1948, petitioner sold "Family Honeymoon" to U–I for $60,000, deeming this the most feasible course left. He reported his profit as long-term capital gain, a treatment accepted by respondent.

At about the same time, U–I employed petitioner to coproduce "Family Honeymoon," at a salary of $26,000. Beck was the producer. The picture starred Fred MacMurray and Claudette Colbert, was distributed in 1948, and was highly successful. Preproduction work required 3 or 4 weeks and the "shooting schedule" occupied 8 weeks.

On July 23, 1948, petitioner purchased the story "Key to the City," intending to form a corporation, transfer the story to it at cost, and produce it, petitioner to act as producer. He sought to interest Clark Gable, but the latter was under long-term contract to MGM and could not participate.

Thereafter, and on February 23, 1949, petitioner sold "Key to the City" to MGM for $117,500, and reported his profit as long-term capital gain. This treatment was acquiesced in after audit of petitioner's 1949 return, except that a part was determined to be short-term capital gain.

At approximately the same time petitioner was hired to produce "Key to the City" at a salary of $50,000. The picture starred Clark Gable, was distributed in 1949, and was quite successful. Petitioner knew at the time of sale that he was to be hired as producer. Preproduction took 6 weeks, and the "shooting schedule" required 8 weeks.

After production of "Key to the City," petitioner was offered a position as staff producer by Columbia Pictures. He rejected the offer in the interest of his own business matters.

Petitioner and Gable continued efforts to organize an independent motion picture company, and on April 27, 1950, purchased the story "Lone Star," each paying one-half of the purchase price of $80,000 and each receiving a one-half interest. They employed one of the coauthors to write a screenplay based on the story.

Petitioner and Gable intended to form a corporation, transfer the story to it at cost, and have it produce "Lone Star" and possibly other pictures. A corporation known as Hudson Pictures was formed, but no shares were ever issued and its corporate powers were suspended as of January 2, 1953.

In late 1950 or early 1951, Gable withdrew from the venture, and on February 1, 1951, sold his interest in "Lone Star" to petitioner for $40,000. On March 26, 1951, petitioner sold the story and screenplay to MGM for $150,000 (plus an additional amount contingent on gross receipts). Petitioner's total net profit was in the amount of $45,500, which he reported on his 1951 return as a long-term capital gain.

On the same day, petitioner was hired by MGM to produce the picture, at a salary of $50,000. The picture starred Clark Gable. Preproduction work required approximately 10 weeks, and the production schedule was 8 weeks.

While petitioner was working on "Lone Star" he and three others purchased another story, "King Arthur and the Knights of the Round Table," for $50,000, each paying $12,500. They intended to produce it themselves, but their plans never materialized. The story was finally sold to MGM in 1952 for $75,000, each purchaser realizing a profit in the amount of $6,250. One of petitioner's coowners had received the offer and prevailed upon the others, including petitioner, to consent to the sale.

Petitioner's activity and compensation as a motion picture producer are summarized as follows:

| Movie | Year produced | Position | Salary |
|---|---|---|---|
| Family Honeymoon | 1948 | Coproducer | $26,000 |
| Key to the City | 1949 | Producer | 50,000 |
| Lone Star | 1951 | Producer | 50,000 |
| Total | | | 126,000 |

His activities with respect to stories and screenplays may be summarized as follows:

| Name | Acquired | | Sold | | |
|---|---|---|---|---|---|
| | Year | Basis | Year | Price | Profit |
| Family Honeymoon | 1946 | $28,433.05 | 1948 | $60,000 | $31,566.95 |
| Genius in the House | 1948 | (1) | (Still held by petitioner) | | |
| Key to the City | 1948 | 30,248.21 | 1949 | 117,500 | 87,251.79 |
| Lone Star | {1950—½ int. / 1951—½ int.} | 104,500.00 | 1951 | 150,000 | 45,500.00 |
| Sundowners | 1951 (7½% int.)[2] | | 1951 | (2) | 1,805.23 |
| King Arthur and the Knights of the Round Table | 1951–1952 (¼ int.) | 12,500.00 | 1952 | 18,750 | 6,250.00 |
| Story by A. L. Crutcher [1] | | 100.00 | | | |
| Total | | | | | 172,373.97 |

[1] The exact basis to petitioner of this story is not clear from the record. Nor is it clear whether this story and the story by A. L. Crutcher (or R. R. Crutcher) are the same. As to the latter, petitioner appears to have paid $100 for the typing of a manuscript, but his interest therein is otherwise not clarified by the record.

[2] This interest was received by petitioner as consideration for the furnishing of a bond. It is not clear whether the picture itself was sold in 1951, but petitioner in any event received $1,805.23 in that year as a result of his interest therein.

In 1951 petitioner was in the trade or business of being a motion picture producer and the sale of "Lone Star" was to a customer in the ordinary course of such trade or business.

The one-half interest in "Lone Star" purchased from Gable was held by petitioner for less than 6 months. His original one-half interest was held by him in excess of 6 months prior to the sale.

### OPINION.

Petitioner has now conceded that he held for over 6 months only his original one-half interest in "Lone Star." The sole remaining issue therefore is the nature of the gain realized on the sale of that interest.

It is well settled that a taxpayer may have more than one trade or business, and that an activity, to constitute a trade or business, need not be carried on full time or throughout the entire working year. In *Snell* v. *Commissioner*, 97 F. 2d 891 (C.A. 5), affirming a Memorandum Opinion of this Court, the Court of Appeals said, at page 892:

The word, notwithstanding disguise in spelling and pronunciation, means busyness; it implies that one is kept more or less busy, that the activity is an occupation. It need not be one's sole occupation, nor take all his time. It may be only seasonal, and not active the year round. * * *

Cf. *Lockhart* v. *Commissioner*, 258 F. 2d 343, 347 (C.A. 3), affirming a Memorandum Opinion of this Court on this issue. Thus, petitioner's extensive activities in managing his father-in-law's estate, while of evidentiary value, do not preclude him from having also been in the trade or business of producing motion pictures.

Petitioner was not in the business of buying and selling stories or screenplays. However, we note that he described his occupation as "Picture Producer" in his 1948 income tax return, and we are satisfied from the entire record and have found as facts that in 1951 he was in the trade or business of being a motion picture producer, and that the sale of "Lone Star" was to a customer in the ordinary course thereof, within the meaning of section 117(a)(1)(A), I.R.C. 1939.[1]

To be sure, a producer of motion pictures, or anyone else in the motion picture industry, may never have occasion to sell a story or screenplay, or may, like any other taxpayer, make such a sale or sales other than in the regular course of his trade or business. Under

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.

(a) DEFINITIONS.—As used in this chapter—

(1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(A) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *

those circumstances, profit from any such casual sale would seem to constitute capital gain. Cf. *Fred MacMurray*, 21 T.C. 15; *Anatole Litvak*, 23 T.C. 441. But that is not the case here.

In *MacMurray*, the named taxpayer had been a movie "star" since 1934, yet at the time of trial in 1953 he had purchased only two stories other than that in issue, one of which he still owned. The other principal taxpayer in the *MacMurray* case had been variously an actor, producer, and director since 1922, and had purchased only one story other than that before the Court. In *Litvak*, the taxpayer, a director since 1929, had purchased and sold a total of three stories, only one of which he directed.

This petitioner never produced anything he did not first sell, and except under unusual circumstances, did not sell anything he did not also produce. Notwithstanding the absence of an express condition that he be hired as producer, the sale here was in the regular and ordinary course of his trade or business, and gain therefrom is taxable as ordinary income. Cf. *Corn Products Co.* v. *Commissioner*, 350 U.S. 46, in which case the Supreme Court said: "The preferential treatment provided by §117 applies to transactions in property which are not the normal source of business income."

As noted, a similar sale by another producer might well be outside the ordinary course of *that* taxpayer's trade or business. Our sole criterion here, however, is the trade or business of *this* taxpayer as carried on by *him*.

Petitioner's attempts to belittle his activities as coproducer of "Family Honeymoon" and his qualifications as a producer are not well taken. He received $26,000 to coproduce "Family Honeymoon," and offers no reason why U–I should be willing to pay such a sum for "nominal" services. And we think it significant that petitioner approached Beck (who eventually acted as producer) only after seeking unsuccessfully to acquire the requisite talent and studio facilities whereby he could produce the picture himself.

The fact that petitioner originally intended to sell "Lone Star" at cost to Hudson Pictures (and act as producer) seems to confirm our view of the sale as in the ordinary course of his trade or business, emphasizing as it does the connection between his work as a producer and the acquisition and disposition of such items. In fact, had this original intention been carried out, he would have received nothing even arguably a capital gain (absent a later liquidation or sale of corporate shares).

We cannot find error in respondent's determination.

*Decision will be entered for the respondent.*