ERNEST H. MARTIN AND NANCY G. MARTIN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

CY FEUER AND POSY LEE FEUER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5013-64, 5014-64.   Filed May 21, 1968.

---

*Benjamin Alpert* and *Myles J. Sachs*, for the petitioners.

*Lawrence J. Shongut*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income taxes against the petitioners Ernest H. Martin and Nancy G. Martin for the taxable years 1955 through 1958 in the respective amounts of $12,850.87, $14,497.90, $68,933.72, and $10,545.34. He determined deficiencies against the petitioners Cy Feuer and Posy Lee Feuer for the taxable years 1955 through 1958 in the respective amounts of $14,776.19, $15,117.76, $72,269.67, and $12,122.08. Hereinafter Ernest H. Martin and Cy Feuer will be referred to as the petitioners.

Certain concessions having been made by the respondent, the issues remaining for decision are (1) whether the amount received in 1955 by the limited partnership, Guys and Dolls Production Co. (of which the petitioners were the general partners), representing a portion of the proceeds from the sale of motion-picture rights to the story "The Idyll of Miss Sarah Brown," constituted ordinary income or capital gain; (2) whether petitioners derived capital gain or ordinary income in 1955 and 1958 from the sale in 1955 of the motion-picture, radio, and television rights to the musical play "The Boy Friend"; (3) whether they derived capital gain or ordinary income in 1956 and 1957 from the sale in 1956 of their rights in the novel "Stay Away Joe"; and (4) whether the petitioner Feuer is entitled to deduct for 1958 a greater amount on account of expenses of operation of a yacht and depreciation thereon than the amount allowed by the respondent, and whether petitioner is entitled to deduct a loss sustained upon the sale of the boat.

### FINDINGS OF FACT

Some of the facts have been stipulated and the stipulations are incorporated herein by this reference.

At the time of filing their petitions the petitioners resided in the city of New York and filed their Federal income tax returns for the years 1955 through 1958 with the district director of internal revenue, Manhattan District, New York, upon the calendar year basis and the cash method of accounting.

Since 1947 the petitioners have been associated together in the production of musical plays on Broadway. They have produced nine shows, namely, "Where's Charley," "Guys and Dolls," "Can-Can," "The Boy Friend," "Silk Stockings," "Whoop-Up," "How to Succeed," "Little Me," and "Skyscraper."

The operations of the petitioners were similar to those of producers generally. They would obtain the rights to produce a play and then transfer all such rights to a limited partnership which undertook to manage and produce the play and to exploit and turn to account all rights in connection therewith. The petitioners as general partners

performed the actual duties of production and presentation of the play, and others as limited partners furnished the necessary financing. The petitioners as general partners would rent a theater, assemble the cast, hire a director, supervise rehearsals, arrange for advertising publicity, etc.

Generally the petitioners obtained from the author of a novel or literary work, commonly referred to as the story, the right to produce a musical play based upon the underlying work. Very few musical plays are original. The owner of the underlying work would grant and assign to them the right to write and compose a musical play based upon the underlying work, to produce and present such musical play on the speaking stage, to own and dispose of the musical play and any subsidiary rights with regard thereto, such as motion-picture, radio, and television rights, and to authorize or permit others to do any of the foregoing. As consideration the petitioners agreed to pay the author a percentage of the box-office receipts and of the proceeds from the sale of the subsidiary rights. The petitioners would then enter into contracts with a librettist to write the play, commonly referred to as the libretto or book, with a composer to compose the music and with a lyricist to write the lyrics. All librettists, composers, and lyricists are members of the Dramatists Guild of the Authors League of America, Inc., and the contracts which the petitioners entered into with them were prescribed by such guild, some modifications being made in individual cases. These contracts are referred to as dramatic-musical production contracts. Therein the petitioners are referred to as managers and the librettist, lyricist, and composer are referred to as author. By such contracts the petitioners "authorized" the authors to write the book, lyrics, and music, and it was provided that such authors should be vested with the legal and equitable title to the musical play and all subsidiary rights therein. By the same contracts the authors granted the petitioners the right to produce and present the musical play, the authors to receive a royalty consisting of a percentage of the box-office receipts. Such contracts further provided that the petitioners would be entitled to a share of the proceeds, usually 40 percent, from any sale by the authors of any subsidiary rights, such as motion-picture, radio, and television rights in the play, provided petitioners timely produced and presented the play according to certain standards and for a specified number of times. A successful stage play usually results in a lucrative sale of the motion-picture rights to such play. The dramatic-musical production contract recognizes this by stating that a "successful run also publicizes the play and adds materially to the value of the subsidiary rights."

When a musical play is to be based on an original literary work such as a novel, the producer generally obtains from the author of such

underlying work all subsidiary rights therein, including the motion-picture rights. This is necessary in order to insure no conflict of interest between the holder of the motion-picture rights to the play and the holder of the motion-picture rights to the underlying literary work. The contract provides for a "merger" of the motion-picture rights to both the play and the motion-picture rights to the underlying work. Thus, all the motion-picture and other subsidiary rights generally pass to the petitioners and then to the play authors.

If, as is sometimes true, the author of the underlying story has already transferred the motion-picture rights to the story to a third party, generally a motion-picture company, before the producer enters into negotiations for the acquisition of the dramatization rights, the producer attempts to obtain from such third party the motion-picture rights to the underlying work for the play authors. Sometimes such motion-picture rights to the underlying work can be bought from the third party, but generally such third party will agree with the producer and the play authors to convey its motion-picture rights to the underlying work to the person who eventually buys from the play authors the motion-picture rights to the play. In such case it is provided that such third party shall receive a percentage of the total consideration paid upon a subsequent disposition of all the motion-picture rights. Sometimes such third party is willing to buy the motion-picture rights from the authors of the play at a lesser price than such rights are offered to others. In some instances the third party is unwilling to enter into any agreement with the producer or the play authors, in which case it is impossible for the play authors to sell the motion-picture rights to the play.

With respect to the musical plays which the petitioners produced, in only one instance, namely, "Skyscraper," was it impossible to obtain the motion-picture rights to the underlying work. In that instance the authors of the play were therefore precluded from selling any motion-picture rights to the play and hence the petitioners obtained no income from that source. In all other instances motion-picture rights were sold either by the petitioners or by the musical play authors, with the result that the petitioners derived income from that source. In each case, except "The Boy Friend" and "Whoop-Up" which are referred to *infra*, it was the play authors who sold the motion-picture rights.

It is rare for a producer of a musical play to acquire from the author of the play the motion-picture and other subsidiary rights to the play.

### "The Idyll of Miss Sarah Brown"

Damon Runyon was the author of a short story entitled "The Idyll of Miss Sarah Brown," hereinafter called "Idyll." On Janu-

ary 20, 1934, Runyon executed an agreement with Paramount Productions, Inc., hereinafter referred to as Paramount, by which he granted and assigned to that company all the motion-picture rights to that story.

On October 1, 1949, the Chase National Bank, executor of the Estate of Damon Runyon, hereinafter referred to as the bank, entered into a contract with the petitioners, granting and assigning to them the exclusive right to compose, produce, and present on the stage a musical play based upon "Idyll" together with the right to "use, sell, lease or otherwise dispose of and deal in the Musical Play and any dramatic, motion picture, radio, television, or other version and adaptation thereof, * * * and to authorize and permit others so to do." The petitioners were also granted the right to use the title "Guys and Dolls" or any variation thereof. In the contract the petitioners agreed to produce and present the musical play upon the stage in the United States or Canada not later than a specified date. It was provided that if petitioners produced the play within the times specified "then and in such event all rights of every kind and nature in and to the Story and the title 'Guys and Dolls' shall be deemed merged in the Musical Play as part thereof, to the same extent as though the said Story and the Musical Play were one single work (together with the title 'Guys and Dolls'), and the Producer or the Dramatists, as their respective interests may appear, shall have the same rights in the Story and the title 'Guys and Dolls' as are acquired hereunder by them in the Musical Play." This, however, was made subject to the rights which Paramount owned in the story.

On April 5, 1950, petitioners as "Manager," entered into a dramatic-musical production contract with Jo Swerling, as "Author," whereby they authorized Swerling to write the book of a dramatic-musical work to be known as "Guys and Dolls." [1] It was provided that the contract would be subject and subordinate to the agreement entered into on October 18 by petitioners and the bank, and would be governed thereby. The contract provided that Swerling "hereby leases to the Manager the sole and exclusive right to produce and present the Book of said play on the speaking stage," but it was provided that unless the play was produced and presented on or before December 31, 1950, the rights granted by Swerling should automatically terminate.

In such contract the petitioners agreed to pay Swerling 2½ percent of the gross weekly box-office receipts against which they would immediately make an advance to him of $1,000.

---

[1] On June 18, 1950, a similar contract was entered into by the petitioners with Abe Burrows to write the book of the play, for which he was to receive 1 percent of the gross weekly box-office receipts.

The contract contains the following provisions with regard to the motion-picture rights:

## SPECIAL ARRANGEMENTS

G. Motion picture rights are governed by an agreement to be entered into between Paramount Pictures, Inc., Jo Swerling and Frank Loesser. Pursuant to said agreement the motion picture rights in the said story will merge in the motion picture rights of the Dramatico-Musical work upon the terms and conditions therein provided, subject to a combined sale, the proceeds therefrom to be divided Fifteen Percent (15%) thereof to Paramount Pictures Inc. and Eighty-Five Percent (85%) thereof to the said authors. Under said agreement, however, Paramount Pictures Inc. is entitled to receive a minimum of Fifteeen Thousand Dollars ($15,000.) as its share of the proceeds from such motion picture rights. It is accordingly agreed that the proceeds from the combined sale shall be divided as follows:

(a) If the Manager is entitled to share in the motion picture rights:

| | |
|---|---|
| Manager | 34% |
| Authors (including Executors of the Estate of Damon Runyon) | 51% |
| Paramount | 15% |

\*          \*          \*          \*          \*          \*          \*

The foregoing percentages specified in subdivisions (a) * * * shall each be subjected to a pro rata share of Negotiator's fee of 3½%.

## SUPPLEMENTAL PROVISIONS

### Article IV

### Motion Picture Rights

Section 1. Disposal of Rights.
provided in Article VIII hereof.

\*          \*          \*          \*          \*          \*          \*

### Article V

### Motion Picture Negotiator

Section 1. Functions.

(a) The Motion Picture Negotiator * * * shall be the person appointed as provided in Section 6 of this Article V, and shall act as the Author's representative in connection with the disposal of the motion picture rights * * *.

(b) The Negotiator and the Author shall, subject to the provisions of Article IV, Section 4, and Article V, Section 2 hereof, and on their sole signatures, have the right to dispose of the motion picture rights free and clear of any claim whatsoever on the part of the Manager, and without his consent. It is the intention of the parties that the Manager shall have no right, title or interest, legal or equitable, in the motion picture rights, other than the right to receive the Manager's share of the proceeds of the motion picture rights * * * as and when such proceeds are actually received by the Negotiator and distributed by him. * * *

\*          \*          \*          \*          \*          \*          \*

### ARTICLE VIII

#### Ownership and Reservation of Rights

Section 1. Full Reservation and Vesting of Title.

(a) The Author shall retain for his sole benefit, complete title, both legal and equitable, in and to all rights whatsoever (including, but not by way of limitation, the Motion Picture Rights, Stock Rights, Amateur Rights, Radio and Television Rights, Publication Rights of Music, and Mechanical Reproduction Rights, Foreign Language Performing Rights in the United States, Performing Rights in Condensed and Tabloid Versions), other than the rights specifically herein leased to the Manager * * *

(b) All rights, now in existence or which may hereafter come into existence, in the play are reserved to the Author, except those specifically leased to the Manager * * *

Article IV of the Supplemental Provisions of the contract provided that if the manager produced and presented the play for the "Requisite Performances and Terms," the negotiator should pay him the above-agreed percentage from the disposal of the motion-picture rights. The term "Requisite Performances and Terms" was defined to mean the timely production of the play by the manager in a first-class theater in a first-class manner with a first-class cast and director, the payment of all royalties due the author, the compliance with all the terms of the contract, and the presentation of the play (1) for 3 weeks of consecutive performances in Manhattan or (2) if first presented in Manhattan, then for 75 consecutive performances partly in Manhattan and partly outside within 3 months of the first performance or (3) if first presented outside of Manhattan, then for at least 75 performances within 4 months of the first performance.

On April 5, 1950, the petitioners, as managers, entered into a dramatic-musical contract with Frank Loesser, as author, whereby they authorized him to write both the music and lyrics for the play "Guys and Dolls." In all essential respects the contract with Loesser was the same as the contract which the petitioners had entered into with Swerling. The petitioners agreed to pay Loesser 5 percent of the gross weekly box-office receipts. As in the case of the contract with Swerling, the contract with Loesser provided that the author retained complete title, both legal and equitable, in all rights with respect to the music and lyrics, "other than those specifically leased to the Manager." It was specifically provided that it was the intention of the parties that the manager "shall have no right, title or interest, legal or equitable, in the motion picture rights, other than the right to receive the Manager's share of the proceeds of the motion picture rights."

On April 28, 1950, Swerling, Loesser, and the petitioners entered into an agreement with Paramount, whereby Swerling and Loesser agreed to write the book, music, and lyrics and petitioners agreed to produce the play. Therein it was agreed that the motion-picture rights to the

musical play should be offered for sale to Paramount before being offered to others. It was provided that if Paramount should not purchase such rights, then if such rights were sold to another, Paramount would convey to the purchaser all its right, title, and interest in the motion-picture rights to the story "Idyll" which it had acquired under the agreement with Runyon in 1934, and receive in consideration a specified sum or a specified percentage of the total price to be paid by the purchaser.

On May 15, 1950, a limited partnership was formed, under the firm name of Guys and Dolls Co. by the petitioners, who were the general partners, and others, who were limited partners, for the "purpose of managing and producing the play, and for the purpose of exploiting and turning to account the rights at any time held by the partnership in connection therewith." The petitioners, as general partners, agreed to contribute to the partnership "all of the rights in the play held by them." They also agreed "to render, in connection with the play, services customarily and usually rendered by theatrical producers" and they were to "have complete control, in their discretion, both of production of the play and the exploitation of all rights therein." The petitioners, as general partners, were to receive 50 percent of the net profits of the partnership, and the limited partners were to receive the remaining 50 percent.

The show "Guys and Dolls" opened on Broadway on November 24, 1950, and ran in New York until October 21, 1953. The road show closed on May 22, 1954.

On March 16, 1953, Paramount, in consideration of the receipt of $75,000, transferred to Loesser, Swerling, and Burrows the worldwide motion-picture rights in and to "Idyll" which it had acquired from Runyon in 1934. On the same date the above agreement of April 28, 1950, was canceled and terminated.

On June 28, 1954, Loesser, Swerling, and Burrows entered into an agreement with Samuel Goldwyn Productions, Inc. (hereinafter referred to as Goldwyn), whereby they sold and assigned all their right, title, and interest in the motion-picture rights with respect to "Idyll" which they had acquired by the above contract of March 16, 1953. In consideration thereof Goldwyn agreed to pay $200,000 upon execution of the agreement and $265,000 on January 3, 1955. By a contract of the same date, Loesser, Swerling, and Burrows granted, conveyed, and assigned to Goldwyn the sole and exclusive motion-picture rights to the play "Guys and Dolls." [2] In consideration thereof,

---

[2] The bank as executor of the Runyon Estate was also a party to this contract and transferred to Goldwyn any motion-picture rights to "Idyll" and to certain Damon Runyon characters to the extent, if any, not theretofore transferred by its contract of June 20, 1934, with Paramount and its subsequent contracts with the petitioners.

Goldwyn agreed to pay $465,000 ($25,000 upon execution of the agreement, $340,000 on January 3, 1955, and $100,000 on January 3, 1956), plus 10 percent of the gross receipts in excess of $10 million from all motion-pictures produced under the agreement.

The partnership return of Guys and Dolls Co. for the taxable year ended October 31, 1955, reported $103,209 received by it with respect to "Idyll" as a long-term capital gain, and it reported $131,399 received with respect to the Guys and Dolls motion-picture rights as ordinary income.

The petitioners each reported his distributive share of the above amount reported by the partnership as capital gain which for the taxable year 1955 amounted to $4,644.42 for the petitioner Martin and $5,676.52 for the petitioner Feuer.[3]

In the notices of deficiency the respondent determined that the gain from the sale of the motion-picture rights to "Idyll" constituted ordinary income and not long-term capital gain as reported by the partnership Guys and Dolls Co., and therefore determined that the above amounts of $4,644.42 and $5,676.52 constituted ordinary income, rather than long-term capital gain, to the petitioners Martin and Feuer, respectively.

### "The Boy Friend"

"The Boy Friend" is a musical play written by an English author, Sandy Wilson. Wilson wrote the book as well as the music and the lyrics. It was presented on the London stage where it was very successful. By February 3, 1954, it had been running in London for at least 2 years.

On February 3, 1954, the petitioners entered into an agreement with Wilson whereby Wilson leased to them the sole and exclusive right to produce and present the book, lyrics, and music of the play on the speaking stage in the United States and Canada. The petitioners agreed to pay Wilson royalties of 6½ percent of the gross weekly box-office receipts.

In such contract it was provided that the petitioners should have the option to purchase from Wilson the worldwide motion-picture rights and the radio broadcasting and television rights to the play for a total sum of £13,750 (equivalent to $38,500), provided such total amount was paid not later than 1 year after the date of the opening of the play in the United States. Of this amount, £2,000 was paid at the time of the signing of the agreement and was designated as an option payment. It was further provided that if the petitioners did not

---

[3] Apparently at that time the combined interest of the petitioners in the partnership was 10 percent.

exercise the option, and if they produced and presented the play, they should be entitled to 40 percent of the net proceeds from the sale of the motion-picture and other subsidiary rights, Wilson to receive the remaining 60 percent.

The play was unlike other plays which had been produced in London and the petitioners were advised that motion-picture companies had shown little interest in making a motion picture of the play. The petitioners, however, acquired the option with the hope that subsequent to the run of the play on Broadway they could, as independent producers, produce a motion picture based on the play. This would depend, however, upon whether they could make arrangements with a motion-picture company to provide the financing and distribution of the motion picture. The petitioners had never produced a motion picture.

On June 25, 1954, a limited partnership, known as the Boy Friend Company, was formed, the petitioners being the general partners, for the stated purpose of managing and producing the stage play and of exploiting and turning to account the rights at any time held by the partnership in connection therewith. The petitioners as general partners agreed to contribute to the partnership all the rights in the play held by them or which might be acquired by them under the agreement with Wilson, and to render, in connection with the play, services customarily rendered by theatrical producers. The petitioners, as general partners, were to receive 50 percent of the net profits of the partnership, and the limited partners were to receive the remaining 50 percent. The partnership agreement contained the following specific provisions:

4. If Cy Feuer and Ernest H. Martin shall exericse their option to acquire the motion picture rights from the Author, then:

(a) If the motion picture rights which are thus acquired are resold to a third person, firm or corporation, the proceeds will be used first to recoup the sums expended by them, and the Limited Partnership will receive forty per cent (40%) of the net proceeds then remaining.

(b) Cy Feuer and Ernest H. Martin shall have the right to exploit the motion picture rights themselves or in association with others, in which event they will be required before exploiting the motion picture rights in their own behalf to meet any bona fide offer which may be made therefor. In the event that there is no such offer a fair market price will be fixed and determined by the motion picture Negotiator of the Dramatists' Guild, which price in the event there is no bona fide offer, shall in no event exceed the sum of One Hundred Thousand Dollars ($100,000). In either event Cy Feuer and Ernest H. Martin shall have the right to pay the Limited Partners twenty per cent (20%) of such determined price, and thereafter all of the motion picture rights shall be owned by Cy Feuer and Ernest H. Martin.

On September 30, 1954, the musical play "The Boy Friend" opened on Broadway and proved to be a success (The Broadway play closed on November 26, 1955, and the road show closed on January 5, 1957).

On October 18, 1954, the petitioners entered into an agreement with Wilson whereby they exercised their option to acquire the motion-picture and other rights to the play, making provision for the payment of the remaining £11,750. Accordingly, Wilson transferred to them the exclusive worldwide motion-picture rights and all broadcasting and television rights in the play. By this time the play had been produced on the stage and had received favorable reviews, and the petitioners exercised the option because they wanted to independently produce a motion picture based thereon. They believed there was a very good chance they would be able to do so, although they had not discussed the matter with any motion-picture company.

After exercising the option, and during the run of the play on Broadway, the petitioners had discussions with motion-picture companies in an attempt to make an arrangement whereby they, the petitioners, might independently produce a motion picture based upon the play, but the discussions proved fruitless. The petitioners thereupon became discouraged with respect to the possibility of their being able to produce the motion picture.

On December 21, 1955, the petitioners entered into an agreement with National Broadcasting Co. whereby they sold and assigned to such company all their right, title, and interest in the above agreement of October 18, 1954, and all rights acquired by them under such instrument, namely, the motion-picture, radio, and television rights. In consideration therefor NBC agreed to pay, and did pay, the petitioners at that time the sum of $125,000, and further agreed to pay them a sum equal to 75 percent of the gross sums which might be received by NBC upon the sale, lease, disposition, or other exercise by NBC of the motion-picture rights to the play.

In 1955 NBC had not yet produced any motion pictures. The discussions in negotiations between the petitioners and NBC leading up to the above agreement were concerned basically with the production of a television show since that was the primary interest of NBC. It was not then contemplated that a motion picture would be made. However, the motion-picture rights were included in the sale because the petitioners deemed it prudent to provide for some benefit from the motion-picture rights in the event that NBC should later decide to make a motion picture of the play.

NBC did not televise the play. On June 26, 1957, NBC entered into an agreement whereby it sold to Loew's, Inc., all the rights which it had obtained from the petitioners. As consideration, Loew's agreed to pay NBC $250,000, payable $175,000 on execution of the agreement, and $75,000 on September 5, 1958.

On the same date the petitioners entered into an agreement with NBC whereby the December 21, 1955, agreement between them was

modified. The petitioners agreed to accept, in lieu of 75 percent of the proceeds from any sale of the motion-picture rights, the sum of $50,000, plus the assignment to them of the payment of $75,000 required to be made by Loew's, Inc., to NBC on September 5, 1958. The above amount of $50,000 was paid by NBC in 1957 to the partnership. The above amount of $75,000 was received by the petitioners in 1958, each receiving $37,500.

In their income tax returns for the taxable year 1955 the petitioners each reported a long-term capital gain of $25,906.62 from the "sale of The Boy Friend television and motion picture rights," [4] of which 50 percent thereof was taken into account in taxable income. In the notices of deficiency the respondent determined that the amounts reported by each petitioner constituted ordinary income from business and not long-term capital gain as reported.

In their income tax returns for the taxable year 1958 the petitioners each reported a long-term capital gain of $37,500 from the sale of "The Boy Friend movie rights," of which 50 percent thereof was taken into account in taxable income. [5] In the notices of deficiency the respondent determined that the amount of $37,500 received by each petitioner constituted ordinary income from business and not long-term capital gain as reported.

## *"Stay Away Joe"*

"Stay Away Joe" is a novel written by Dan Cushman. On September 1, 1955, the petitioners entered into an agreement with Cushman whereby Cushman granted them the exclusive right to write, produce, and present on the stage a musical play based upon such novel. The petitioners agreed to place the play in rehearsal not later than 12 months from the date of the agreement, or not later than 2 years thereafter upon the making of certain payments, and to produce and present the play in due course thereafter. It was provided that if the

---

[4] Each petitioner in his return reported a gross sales price of $45,228.92 and a cost basis of $19,322.30, resulting in the reported gain of $25,906.62. Under paragraph 4(a) of the partnership agreement the petitioners were entitled to recover the cost of the rights, after which any amount received from NBC was to be divided in the proportion of 60 percent to the petitioners individually and 40 percent to the partnership. The amount which they paid Wilson for the rights was $38,500, and they apparently incurred some additional costs of $144.60. Thus, of the $125,000 paid by NBC in 1955 there remained $86,355.40, of which 40 percent or $34,542.16 was due the partnership. Thus, of such $125,000 the petitioners individually retained $90,457.84 or $45,228.92 each.

Apparently the petitioners' distributive shares of the partnership's 40 percent were reported as ordinary income. At least no question was raised in this respect by the respondent.

[5] The $37,500 reported by each is one-half of the $75,000 paid by Loew's, Inc., on behalf of NBC to the petitioners individually in 1958. This $75,000 represented the 60 percent which the petitioners individually were entitled to receive under the partnership agreement, and the $50,000 which NBC paid in 1957 to the partnership represented the partnership's 40 percent. Here again apparently such $50,000 received by the partnership was treated as ordinary income, or at least no question has been raised by the respondent in this respect.

petitioners timely produced the play, all rights, including the motion-picture, radio, and television rights, in the play and in the underlying novel should become the absolute property of the petitioners and any dramatists as their respective rights might appear. Cushman was to receive one-half of 1 percent of the gross box-office receipts and a share of the royalties or proceeds from the sale, lease or other disposition of the motion-picture and certain other rights. If the petitioners did not timely produce the play all rights would revert to Cushman.

The petitioners had intended to have the composer-lyricist team of Ross and Adler write the musical play, and contracts were drawn for that purpose. However, Ross died suddenly in September 1955, and the petitioners were then uncertain as to whether they would be able to produce a musical play within the time limit set in the contract with Cushman. They thought that the novel had possibilities for a stage show, for a television series, for a motion picture, or for some other production. They proceeded to have discussions with a representative of Loew's, Inc., regarding the possibility of their entering into an arrangement with that company whereby they might become independent motion-picture producers,[6] and produce motion pictures based upon various works, including the novel "Stay Away Joe." The petitioners decided that it would be desirable to acquire all the rights in the novel and hold them until they decided how best to use them, and not be under the pressure of the time limit in the existing contract with Cushman.

On January 15, 1956, they terminated their agreement of September 1, 1955, with Cushman and on January 16, 1956, entered into a new contract with Cushman whereby Cushman, in consideration of $25,000, assigned to them all rights, including dramatic, motion-picture, television, and radio rights, to the novel "Stay Away Joe," except the publication rights. On the same date the parties entered into a further agreement, however, which provided that if petitioners, in their sole discretion, produced and presented, or authorized the production and presentation, of a play based upon the novel, Cushman would be entitled to certain specified percentages of the gross box-office receipts and a proportionate share of receipts from the sale, lease, or other disposition of the motion-picture and additional rights in the play, to the extent such receipts exceeded $25,000.

After the petitioners had acquired all the rights in the novel "Stay Away Joe," a representative of Metro-Goldwyn-Mayer (a subsidiary

[6] The function of an independent producer differs from that of a staff producer who is an employee of the motion-picture company. Under an independent motion-picture producer arrangement the producer retains all the rights in the basic work and actually produces the picture. The motion-picture company furnishes the necessary financing and distributes the motion picture, receiving a distribution fee and sharing the profits with the independent producer.

of Loew's, Inc.) suggested to the petitioners that they make an arrangement with Loew's, Inc., whereby they, as independent producers would produce a motion picture based upon the novel "Stay Away Joe" and also make other motion pictures. The petitioners, however, decided not to take the risk of such an undertaking. Such representative then suggested that the petitioners sell to Loew's, Inc., all the rights which they had in the novel. Thereupon the petitioners agreed to sell, and on July 26, 1956, they entered into an agreement with Loew's, Inc., transferring to Loew's all the rights which they had acquired from Cushman. From the time they acquired such rights until the time they sold them the petitioners did not exploit any of such rights, but were merely considering the various possibilities for exploiting them. The agreement with Loew's, Inc., provided that as full consideration for the right, title, and interest transferred, Loew's would pay petitioners $250,000, payable $72,500 on the date of execution of the agreement, $127,500 on January 10, 1957, and $50,000 on April 1, 1957.

On August 17, 1956, petitioners entered into another contract with Loew's whereby petitioners granted Loew's an option to employ them as producers of a motion picture to be based on the novel "Stay Away Joe," exercisable by September 30, 1956. Such contract provided for compensation to be paid by Loew's, Inc., to each of the petitioners of $601 per week for a period of 1 year from the date of the exercise of the option.[7] Loew's exercised the above option on or about September 20, 1956. Loew's also employed a writer to write the screenplay for a flat fee of $100,000.

After such writer read the novel "Stay Away Joe" he conceived the idea of writing the story for a musical play, instead of a motion picture. He convinced Loew's that petitioners should be allowed to make the story into a Broadway show and defer any idea of making a motion picture until after a successful stage run. Loew's agreed, granting such writer an exclusive license to the dramatic-musical rights in the novel, canceling the employment contract with the petitioners, and reinstating the above option upon the services of the petitioners.

The petitioners were not satisfied with the story for the musical play which was written. Accordingly, in early 1957 they abandoned the idea of producing the stage play and so informed Loew's, Inc., on April 15, 1957. Thereupon Loew's reinstated the petitioners' contract to work as producers of the screenplay. Due to a number of circumstances, the motion picture was not produced.

On January 27, 1958, petitioners and Loew's, Inc., executed an agreement whereby Loew's licensed the dramatic-musical rights in "Stay Away Joe" to petitioners in return for a share of any net profits,

---

[7] In 1956 the amount customarily paid by a motion-picture company as a fee to a producer of a musical screen production ranged from $50,000 to $75,000.

and the petitioners granted Loew's, Inc., the motion-picture rights to the play.

On September 24, 1958, the petitioners formed a limited partnership, known as Whoop-Up Co., to produce a musical play based upon the novel "Stay Away Joe," to be known as "Whoop-up". Such play opened in New York on December 22, 1958, but was not a success, and closed on February 7, 1959.

In their income tax returns for the taxable year 1956 the petitioners each reported a long-term capital gain of $32,625 on account of the payment received from Loew's, Inc., in that year.[8] In their returns for the taxable year 1957 each reported a long-term capital gain of $79,875 on account of the payment received from Loew's, Inc., in that year.[9] In the notices of deficiency the respondent determined that "your share of the gain from the sale of the novel 'Stay Away Joe' realized in 1956 and 1957 * * * constituted ordinary income from your business and not long-term capital gains as reported * * *."

### The Yacht Issue

On January 31, 1957, petitioner Feuer entered into an agreement with C. E. Ackerman, doing business as the Ackerman Boat Works in Newport Beach, Calif., for the purchase of a 40-foot sailing yacht known as The Newporter model for the sum of $17,500, which was far below the usual cost of a boat of this type. The agreed delivery date was July 7, 1957. At the time of the agreement Feuer was living in New York but expected to go to California and work for Loew's, Inc., for about a year. The petitioner did not purchase the boat for the purpose of resale. He intended to use the boat in California for his own personal use. His original intention was to later have the boat shipped to Miami for use in the Bahama Islands or the Virgin Islands where it would be available for his personal use for a few weeks during the winter period. He also thought he would take the boat to the New York area during the summer months where it would be available for his personal use. He also intended to make the boat available for charter to others when he did not desire to use it personally. He wanted to own the boat so it would be available for his personal use, but felt that he could not afford to do so unless by chartering it he could have the boat "sustain itself." Feuer had previously owned several boats but had never chartered one to others.

Due to the fact that Ackerman went into bankruptcy delivery of the boat was delayed until October 1957, and the cost of the boat was increased. The total cost of the completed boat was $32,150. Upon obtaining the boat, the petitioner Feuer used it personally several times in

---

[8] Each reported a gross sales price of $36,250 (one-half of the $72,500 payment made by Loew's in 1956) against which each applied a basis of $3,625.

[9] Each reported a gross sales price of $88,750 (one-half of the total payments made by Loew's that year) against which each applied a basis of $8,875.

1957 "shaking it down" or "testing it out," but never used it overnight. Upon receiving the boat Feuer immediately offered it for charter through an agent. However, it was not chartered in 1957. The charter season in California is during the summer months. The boat was chartered for a total of 14 days to four different parties during the period from May 10 to June 13, 1958, for a total of $950 in charter fees. Each charter provided that the charterer (as distinguished from the owner) would pay all expenses in connection with the navigation and operation of the yacht, including wages of the crew, food, fuel, supplies, and insurance. The petitioner used the boat personally for day sailing "on and off" in 1958 up to the time that he left California for New York in June or July 1958.

In view of the fact that the boat cost him more than he had originally contemplated, and in view of the transportation costs, the petitioner, at some time not disclosed by the record, abandoned the idea of shipping the boat to Miami. When he left California for New York he left the boat for sale by a broker. It was sold on July 13, 1958, for $26,500, less sales expenses of $2,455, or a net amount of $24,045. Since that time the petitioner has chartered Newporters for his personal use.

In his income tax return for the taxable year 1958, the petitioner Feuer reported a net loss from the operation of the boat in the amount of $809.41, which he used to offset other taxable income. In computing such net loss the petitioner offset against the charter fees of $950, operating expenses of $1,394.18 and depreciation of $365.23. In such return he also reported a loss of $7,790.59 on the sale of the boat, designating such loss as a loss upon the disposition of property other than a capital asset. Such loss was used to offset other taxable income shown in the return.

In the notice of deficiency the respondent disallowed the loss of $809.41 claimed on the operation of the boat and also disallowed the loss of $7,790.59 claimed on account of the sale of the boat, stating that "you have failed to establish that the losses were incurred in a trade or business or in a transaction entered into for profit."

Neither the purchase and sale nor the operation of the boat constituted a trade or business of the petitioner. Nor was the loss upon the sale of the boat a loss incurred in a transaction entered into for profit.

OPINION

*"The Idyll of Miss Sarah Brown"*

The petitioners contend that the amount received by the partnership, Guys and Dolls Co., in its taxable year ended October 31, 1955, as its share of the proceeds from the sale of the motion-picture

rights to "Idyll," was long-term capital gain, and that hence their distributive shares thereof as general partners (namely, $4,644.42 to petitioner Martin and $5,676.52 to petitioner Feuer) for their taxable year 1955 constituted long-term capital gain. See sec. 702(a)(2) and (b), I.R.C. 1954. The respondent, on the other hand, contends that the amount received by the partnership, and hence the partners' distributive shares thereof, constituted ordinary income.

Section 1222(3) of the Internal Revenue Code of 1954 provides that the term "long-term capital gain" means "gain from the sale or exchange of a capital asset held for more than 6 months." Section 1221 [10] provides that the term "capital asset" means "property held by the taxpayer," with certain exceptions. The petitioners contend that the partnership's share of the proceeds constituted capital gain "because its interest in those proceeds was a capital asset under Section 1221." It is the position of the respondent that neither the petitioners nor the partnership sold or exchanged any asset (whether capital or not), that the authors of the play sold the motion-picture rights to both the play and the story, and that the partnership's share of the proceeds was obtained in the ordinary course of its trade or business of producing the play and deriving income in part from the sale of the ancillary rights.

We think that the respondent properly determined that the amount in question received by the partnership constituted ordinary income. We agree with his view that there was no sale or exchange by the partnership of any asset, which, of course, is one of the prerequisites to capital gains treatment. Neither the petitioners nor the partnership ever acquired the motion-picture rights to the underlying story, "Idyll." The authors of the play acquired them from Paramount. In the contract between the petitioners and the authors of the play, it was specifically provided that such authors would retain complete title, both legal and equitable, and that the petitioners should have no title or interest in such rights, other than the right to receive a share of the proceeds from the sale of the rights. It should be pointed

---

[10] Sec. 1221 provides in part as follows:

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

(2) property, used in his trade or business of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

(3) a copyright, a literary, musical, or artistic composition, or similar property, held by—

(A) a taxpayer whose personal efforts created such property, or

out that while the petitioners on brief state that they were required to pay a part of the purchase price of the "Idyll" motion-picture rights, implying that they therefore owned an interest in such rights, there is no evidence whatever in the record to substantiate this.

We think it clear that the amount in question constituted ordinary income derived by the partnership from the conduct of its business of producing the play, "Guys and Dolls." We have described in some detail in the Findings of Fact the manner in which the petitioners, through limited partnerships, carried on the business of producing Broadway shows. The production of the play "Guys and Dolls" and the realization of income from the exploitation of the subsidiary rights therein is typical of their customary activities. They, through the partnership, produced and presented the play under a contract with the play authors whereby, in consideration of their timely production of the play in a first-class theater in a first-class manner with a first-class cast and director, and upon the presentation of the play for a minimum number of performances within a specified time, were entitled to a percentage of the proceeds from the sale of the motion-picture and subsidiary rights therein. The contract between the petitioners and the play authors provided that the motion-picture rights to both the play and the original story "Idyll" would merge and be subject to a combined sale and that the petitioners would receive a percentage of the proceeds of the sale. Thus, the income in question was ordinary income from the partnership's business of producing and presenting the musical play and thereby benefitting from the exploitation of the subsidiary motion-picture rights in both the play and the underlying literary work. It follows that, as determined by the respondent, the petitioners' distributive shares of the gain in question constituted ordinary income. See *Commissioner* v. *Ferrer* (C.A. 2) 304 F. 2d 125, affirming in part and reversing in part 35 T.C. 617, in which it was clearly indicated that had the taxpayer in that case produced the play and received an amount representing a percentage of the proceeds from the sale of motion-picture rights such amount would have constituted ordinary business income.

### *"The Boy Friend"*

The petitioners contend that the gain which they individually, as distinguished from their partnership, derived in 1955 and 1958 from the sale to NBC in 1955 of the motion-picture, radio, and television rights to the musical play "The Boy Friend" constituted long-term capital gain. Their position is that such rights constituted capital assets under the definition contained in section 1221 of the Code, held for more than 6 months, and that therefore the gain is long-term capital gain under section 1222(3), or that such rights constituted property

used in their trade or business within the definition contained in section 1231(b)(1),[11] and that hence under section 1231(a)[12] the gain is to be considered as gain from the sale of a capital asset held for more than 6 months. It is their position that such rights did not constitute property held by them primarily for sale to customers in the ordinary course of their trade or business.

The respondent takes the position that such rights did constitute property held by the petitioners primarily for sale to customers and that in any event the income should be considered ordinary income under the broad principles enunciated in *Corn Products Co.* v. *Commissioner*, 350 U.S. 46, and *Commissioner* v. *Gillette Motor Co.*, 364 U.S. 130. Those cases establish that the term "capital asset" is to be construed narrowly in order to effectuate the congressional purpose of taxing as ordinary income the profits arising from the everyday operation of a business; that the preferential capital gains treatment was intended to apply to transactions in property which are not the normal source of business income; and that the capital gains provisions were intended to relieve taxpayers from excessive tax burdens on gains resulting from the conversion of capital investments.[13]

---

[11] Sec. 1231(b)(1) of the Code provides as follows:

(b) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For purposes of this section—

(1) GENERAL RULE.—The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not—

(A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year,

(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or

(C) a copyright, a literary, musical, or artistic composition, or similar property, held by a taxpayer described in paragraph (3) of section 1221.

[12] Sec. 1231(a) of the Code provides as follows:

(a) GENERAL RULE.—If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion * * * of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. * * *

[13] In *Corn Products Co.* v. *Commissioner*, 350 U.S. 46, the Supreme Court stated in part: Admittedly, petitioner's corn futures do not come within the literal language of the exclusions set out in that section. They were not stock in trade, actual inventory, property held for sale to customers or depreciable property used in a trade or business. But the capital-asset provision of § 117 must not be so broadly applied as to defeat rather than further the purpose of Congress. *Burnet* v. *Harmel*, 287 U.S. 103, 108. Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income. It was intended "to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions." *Burnet* v. *Harmel*, 287 U.S. at 106. Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions

The respondent states that for many years the petitioners, in their business of producing Broadway shows, have acquired and disposed of motion-picture and television rights and that the profit potential in the production of a successful Broadway show includes the income obtainable from the sale of all the ancillary rights, including motion-picture and television rights.

As has been shown in the findings of fact, it was customary for the petitioners to obtain from the author of an underlying literary work the right to produce a play which carried with it the subsidiary rights, such as motion-picture, radio, and television rights, to the play, and to also obtain, when possible, the motion-picture, radio, and television rights to the underlying literary work. However, these rights were not held by them for sale in the normal sense. Rather, by the guild contracts which they executed with play authors, they in effect transferred the dramatization and ancillary rights to the play authors and the play authors in turn granted the petitioners the right to produce and present the play on the stage in consideration of a royalty of a percentage of the box-office receipts. The contracts provided that absolute ownership in the motion-picture and other subsidiary rights should be in such authors. The petitioners were entitled to a percentage of the proceeds of any sale by the authors of such subsidiary rights if they timely produced the stage play. The petitioners then customarily set up a limited partnership in each instance to produce the play, transferring all their rights to the partnership. After a successful run of the Broadway musical the play authors customarily sold such subsidiary rights, retaining 60 percent of the proceeds and paying over 40 percent of the proceeds to the limited partnership which produced the play. As pointed out hereinabove in connection with "The Idyll of Miss Sarah Brown," the portion received by the limited partnerships unquestionably constitutes ordinary income. Neither the partnerships nor the petitioners individually customarily held and sold the subsidiary rights.

The production of the musical play "The Boy Friend" involved circumstances different from those surrounding the plays normally produced by the petitioners. In this instance they acquired directly

---

interpreted broadly. This is necessary to effectuate the basic congressional purpose. This Court has always construed narrowly the term "capital assets" in § 117. See *Hort* v. *Commissioner*, 313 U.S. 28, 31; *Kieselbach* v. *Commissioner*, 317 U.S. 399, 403.

In *Commissioner* v. *Gillette Motor, Co.*, 364 U.S. 133, the Supreme Court stated in part: While a capital asset is defined in § 117(a) (1) as "property held by the taxpayer," it is evident that not everything which can be called property in the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset. This Court has long held that the term "capital asset" is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year. * * *

from Wilson, the author of a musical play which had been successful in England, the right to produce such play on the speaking stage in the United States and in Canada. Their contract with Wilson gave them an option to purchase from him the motion-picture and other subsidiary rights to the play, but provided that if they did not exercise the option then the usual arrangement would prevail with respect to the distribution of the proceeds from any sale of such subsidiary rights, namely, 60 percent to Wilson and 40 percent to them. The petitioners then, in the usual manner, set up a limited partnership to produce the play. The partnership agreement provided that if the petitioners should exercise the option and then sell the subsidiary rights, the partnership would receive 40 percent of the net proceeds after the petitioners had recouped their cost of the rights, and the petitioners would retain the rest. Since, however, the petitioners had in mind that they might, as independent motion-picture producers, produce a motion picture based on the play, the partnership agreement provided that in such event the petitioners should pay the limited partners an amount equal to 20 percent of the value of the motion-picture rights.

The musical play was duly produced and was successful. The petitioners then exercised the option to purchase the subsidiary rights from Wilson. However, they had to abandon their idea of producing a motion picture and, shortly after the close of the play on Broadway they, in 1955, sold the motion-picture, radio, and television rights to NBC. They received at that time $125,000 from NBC and were entitled to a percentage of any gross sums which NBC might later receive upon the sale or other exploitations of the motion-picture rights. Apparently, the petitioners' partnership received its 40 percent of this payment. Later, in 1957, NBC disposed of all its rights and as a consequence in 1957 it paid the petitioners' partnership $50,000 and in 1958 it, through Loew's, Inc., paid the petitioners individually $75,000. The petitioners' partnership thus also received its 40 percent of the subsequent payments totaling $125,000. These amounts received by the partnership constituted ordinary income to it and hence to the partners, including the petitioners. Apparently these amounts were reported as ordinary income by the partnership and by the petitioners as partners; at least the respondent has raised no question with respect thereto. However, the remaining 60 percent of the $125,000 paid by NBC in 1955 and the full amount of $75,000 paid by NBC in 1958 which the petitioners individually received were treated by them in their returns as proceeds from the sale of capital assets.

It is true, as the respondent states, that the petitioners customarily received income from the sale of the motion-picture and other subsidiary rights to plays which they had produced, and that the value of such rights, and hence the amount which they received from this

source, resulted largely from their personal efforts in producing the stage play. We agree that the portion of the proceeds from the sale of these subsidiary rights which the partnership earned as a result of the production of the play should be treated as ordinary income under the broad concept that the exploitation of the subsidiary rights was a normal source of income in the business of producing stage plays. See *Corn Products Co.* v. *Commissioner, supra.* Indeed, as pointed out above, the parties apparently agree that in the present instance such portion of the selling price of the rights constitutes ordinary income. However, here the petitioners separately, and not as members of the partnership which produced the play, made a cash investment of $38,500, plus a relatively small additional amount, in the subsidiary rights, for a purpose other than the customary exploitation of the subsidiary rights, namely, for the purpose of using such rights in connection with the production by them, as independent motion-picture producers, of a motion picture based upon the play. We have so found, based upon the unequivocal testimony of the petitioner Martin. In effect what they did was to purchase in their individual capacities an interest in the subsidiary rights separate and apart from their customary business. Accordingly, it cannot be said that the profit derived from the sale of such interest in the rights constituted ordinary income in their regular trade or business, even though the amount which they were able to derive from the sale may have been due in part to the fact that they had produced a successful stage play. As it turned out, the petitioners did not enter into the business of independent motion-picture producers, and therefore the rights did not become property used in any such trade or business. Under the circumstances, we think their interest in the rights constituted, at the time of sale, a capital asset, and that the gain upon the sale constituted long-term capital gain.

### *"Stay Away Joe"*

In this instance the petitioners originally entered into the usual contract to acquire from the author of the novel "Stay Away Joe" the dramatization and subsidiary rights, with the intention of producing a musical play based upon such novel. However, due to the death of one of the prospective play writers, the petitioners became uncertain as to whether or when they might be able to produce a play, and accordingly terminated their agreement with the author of the novel and, instead, entered into a new agreement with him whereby they purchased all his interest in the novel, except the publication rights. Thereafter, until they sold all their interest in the novel they considered various possibilities with regard to the use of the rights, including the production of a stage play and the production, as independent producers, of a motion picture based upon the novel. They

were uncertain as to just how they would exploit the rights which they owned.

Here again the petitioners contend that the gain derived by them in 1956 and 1957 from the sale of the rights constituted long-term capital gain under either section 1221 or section 1231 of the Code. The respondent maintains that the rights constituted stock in trade or property held primarily for sale to customers in the ordinary course of their trade or business and that hence the gain is ordinary income.

We think it must be concluded that the petitioners were not holding their rights in the novel for sale to customers in the ordinary course of any trade or business carried on by them. They were not in the trade or business of buying and selling rights in literary works. Even if it were assumed that their primary purpose in acquiring all the rights in the novel was to produce a musical stage play which was customary in their business, it could not be considered that the rights were held for sale to customers in any normal sense of the word. As has been heretofore pointed out, neither the petitioners nor their limited partnerships customarily held or sold the dramatization or subsidiary rights in an underlying work. Rather, the petitioners customarily transferred the rights to play authors who, after the production and presentation of the play, customarily sold the motion-picture and subsidiary rights, the petitioners or their partnerships receiving a percentage of the proceeds due to their having produced and presented the stage play. We think the gain in question was not derived from a source of income which was normal in the petitioners' business.

The present transaction was unique in the petitioners' business experience. They did not produce a play, and indeed at the time they acquired all the rights in the novel they had no specific intent as to the use to which the various rights would be put. It is our conclusion that under the circumstances it should be considered that the petitioners held the rights in the novel as a capital asset, and that the proceeds from the sale thereof constituted long-term capital gain. Since they did not in fact produce a play in this instance, it cannot be said that any portion of the gain constituted ordinary income under the broad concept that the exploitation of subsidiary rights was a normal source of income in their business of producing stage plays.

The respondent also makes the contention that the amount paid to the petitioners in excess of the original cost of the rights, $25,000, in reality constituted a payment to the petitioners by Loew's, Inc., to obtain their services as employees to produce a play based upon the novel. However, the contract by which the rights were sold to Loew's, Inc., was entirely separate from the contracts regarding their employment, and preceded the latter. Furthermore, the contract of employment provided for compensation which was commensurate with the

rate customarily paid by motion-picture companies. We think that the full amount of $250,000 which was paid by Loew's, Inc., to the petitioners was for the rights in the novel which were transferred.

## The Yacht Issue

The parties have agreed that during the taxable year 1958 the petitioner Feuer incurred expenses in the operation of his yacht in the amount of $1,394.38, and that during that year the boat sustained depreciation in the amount of $350. The petitioner's principal contention is that the chartering of the boat constituted a trade or business and that therefore these amounts are deductible in full under section 162(a) or, alternatively under section 212 of the Code.[14] See also section 167(a) of the Code. The respondent determined that the operation of the boat did not constitute the carrying on of a trade or business and accordingly contends that the amounts in question are not deductible in full. On brief the respondent does not discuss the applicability of section 212.

We agree with the respondent that the operation of the boat did not constitute the carrying on of a trade or business, and we have so found as a fact. We think there can be no question from the evidence that the petitioner purchased the boat for the purpose of having it available for his personal use. It is true that he did have in mind chartering the boat when he did not desire to use it himself, but this was only for the purpose of attempting to recoup expenses. He did not acquire the boat for the purpose of deriving a profit either from its operation or its sale. The substance of the petitioner's testimony was that he wanted to own a boat and keep it available for his use whenever he could possibly get away, that he could not afford this without chartering it and getting some income from it, and that therefore it was his purpose to charter the boat, if he could, whenever he was not using it himself, in order to have the boat sustain itself. Accordingly, we hold that the petitioner is not entitled to deduct the expenses under section 162 as ordinary and necessary business expenses. Nor is the petitioner entitled to a deduction for depreciation on the boat under section 167(a)(1), which provides for the deduction of depreciation on property used in a trade or business.

However, the petitioner did charter the boat and receive charter fees in the amount of $950 in the taxable year 1958. This amount constitutes

---

[14] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *
Sec. 212 of the Code provides as follows:
In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—
(1) for the production or collection of income;
(2) for the management, conservation, or maintenance of property held for the production of income; * * *

taxable income within the meaning of section 61 of the Code, and under sections 212 and 167(a)(2) of the Code he would be entitled to deduct the expenses paid or incurred for the production of such income and expenses for the maintenance of the boat and depreciation on the boat for the time chartered. The net effect of the respondent's determination was to allow the petitioner to deduct an amount equal to the amount of the charter fees earned, namely, $950. The petitioner has failed to establish that he is entitled to deduct a greater amount on account of expenses and depreciation. Indeed, in view of the fact that the charters provided that those who chartered the boat would bear the expenses of operation of the boat when used by them, it would appear that the respondent was generous in his determination of the amount deductible.

The parties are also in agreement that the petitioner sustained a loss of $7,755 on the sale of the yacht in 1958. The petitioner contends that such loss is deductible under section 165(c)(1) of the Code as a loss incurred in a trade or business or, alternatively, under section 165(c)(2) as a loss incurred in a transaction entered into for profit.[15] What we have said above disposes of the contention that the loss was one incurred in a trade or business. Nor can it be considered that the loss was one incurred in a transaction entered into for profit. As stated above, the petitioner's reason for acquiring the yacht was a personal one. He did not acquire the boat for the purpose of resale at a profit. Nor, as pointed out above, did he operate the boat for the purpose of making a profit, but merely to recoup expenses.

In view of the foregoing, we approve the respondent's disallowance of the claimed losses on account of the operation and sale of the yacht.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

———

Raum, *J.*, dissenting: I join in Judge Tannenwald's dissenting opinion, but wish merely to add a word about *Fred MacMurray*, 21 T.C. 15, and *Anatole L. Litvak*, 23 T.C. 441. Here, petitioners, as a regular and recurring part of their operations, derived income from the sale of motion-picture rights in respect of stories forming the

---

[15] Sec. 165 of the Code provides as follows :
SEC. 165.  LOSSES.
   (a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

   *   *   *   *   *   *   *

   (c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—
      (1) losses incurred in a trade or business ;
      (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business ; * * *

basis for the conduct of their business as producers. I think it should be of no consequence what form such sales took; nor should it be a matter of critical importance that the sales had their origin in circumstances like those presented in this case. *MacMurray* and *Litvak* involved only isolated sales, and are therefore sharply to be distinguished.

DRENNEN and TANNENWALD, *JJ*., agree with this dissenting opinion.

---

FAY, *J*., dissenting: I believe the petitioners held the motion-picture rights in "The Boy Friend" and "Stay Away Joe" primarily for sale to customers in the ordinary course of their business.

---

TANNENWALD, *J*., dissenting in part: I have no quarrel with my colleagues in the majority insofar as their conclusion that petitioners' receipts from the sale of the motion-picture rights to "The Idyll of Miss Sarah Brown" is concerned. Such receipts in my opinion clearly constituted ordinary income. My difficulties relate to the long-term capital gains treatment accorded petitioners' receipts from the sale of the movie rights to "The Boy Friend" and "Stay Away Joe." I think these receipts should also be held to constitute ordinary income to petitioners.

Fortunately, there is no disagreement between the parties that the motion-picture rights to "The Boy Friend" and "Stay Away Joe" constituted property in petitioners' hands capable of being the subject matter of a sale. We are thus not confronted with some of the elusive and frustrating questions which were so carefully and lucidly analyzed by Judge Friendly in *Commissioner* v. *Ferrer*, 304 F.2d 125 (C. A. 2, 1962). See also Eustice, "Contract Rights, Capital Gain, and Assignment of Income—the Ferrer Case," 20 Tax L. Rev. 1 (1964). Rather, the issue before us is whether petitioners' sales of these conceded property rights gave rise to capital gain or ordinary income. In this context, our focus is directed to the question of whether such rights constituted "property held by the taxpayer [petitioners] primarily for sale to customers in the ordinary course of [their] trade or business," in which event the receipts would be expressly excluded from the preferential treatment embodied in sections 1221 and 1231.[1] See sec. 1221(1) and sec. 1231(b)(1)(B).

With the question before us thus narrowly focused, we need not go so far as to accept respondent's contention that petitioners should

---

[1] An affirmative resolution of this question obviates the necessity of considering the further question whether such rights constitute "property used in [a] trade or business, of a character which is subject to the allowance for depreciation." Secs. 1221(2) and 1231(a).

be denied capital gains benefits simply on the ground that petitioners held the motion-picture rights for sale "in connection with" their trade or business as theatrical producers. While this sweeping construction of section 117(a)(1) of the Internal Revenue Code of 1939 (the predecessor of section 1221) seems to have been rejected by this Court in *Fred MacMurray*, 21 T.C. 15 (1953), and *Anatole Litvak*, 23 T.C. 441 (1954), it should be noted that both these cases were decided prior to the enunciation by the Supreme Court of its pervasive warning that the capital gains provision of the Code is to "be narrowly applied and its exclusions interpreted broadly" (see *Corn Products Co.* v. *Commissioner*, 350 U.S. 46, 52 (1955), and *Commissioner* v. *Gillette Motor Co.*, 364 U.S. 130, 134 (1960))—a warning which, while not without its limitations (cf. *Commissioner* v. *Brown*, 380 U.S. 563 (1965)), still flourishes with considerable vitality (cf. *United States* v. *Midland-Ross Corp.*, 381 U.S. 54, 56–57 (1965); compare *Z. Wayne Griffin*, 33 T.C. 616 (1959)).

It is against this background of narrow legislative interpretation that the petitioners must satisfy their burden of proof that they did not hold the rights in question "primarily for sale to customers in the ordinary course of [their] trade or business." This, in my opinion, they have failed to do. Petitioners historically and consistently looked to the sale of the motion-picture rights to the plays they produced as a major source of income. Admittedly, in the normal case, they did not acquire the rights themselves but rather participated with the author in such exploitation by sale. Nevertheless, under the standard dramatic-musical production contracts, the producer's (or manager's) participation envisaged active involvement in the sale of the movie rights by the author. Cf. *Commissioner* v. *Ferrer, supra.* To me, it would be most unrealistic to say that because the petitioners' motion-picture rights in "The Boy Friend" and "Stay Away Joe" took a different form, the receipts therefrom should *necessarily* be accorded a different treatment than that accorded to their participation in the sale of motion-picture rights under normal circumstances. Indeed, petitioners, themselves, do not seriously so contend.

The nub of petitioners' argument is that, with respect to "The Boy Friend" and "Stay Away Joe," they acquired the motion-picture rights to these works with the intention of becoming independent motion-picture producers and that only after they determined that this course of action could not be implemented did they sell the rights. Therefore, they argue that the motion-picture rights were not held for sale to customers primarily in the course of their claimed business as motion-picture producers.

In my opinion, the record simply does not sustain this assertion. Certainly, as to "Stay Away Joe," petitioners abandoned their inten-

tion to produce a motion picture, if not before, then immediately after, the intention was formed. And, even in the case of "The Boy Friend," the evidence is far from clear that petitioners did any more than carry on discussions of sorts about the possibility of independently producing a motion picture. The cardinal fact, from which petitioners cannot escape, is that they never embarked upon a meaningful course of action involving independent motion-picture production. Thus, even if we assume that *Fred MacMurray, supra,* and *Anatole Litvak, supra,* retain their undiluted vitality despite the subsequent warning by the Supreme Court (see p. 367, *supra*), they are clearly distinguishable. In *MacMurray,* the taxpayer was in fact a prominent actor who acquired the rights involved therein in furtherance of his acting business. In *Litvak,* the taxpayer was in fact a noted motion-picture producer who acquired the rights involved therein in furtherance of his motion-picture producing business.

In my opinion, the most that can be said, on the basis of the record herein, is that petitioners' plans with respect to the motion-picture rights to "The Boy Friend" and "Stay Away Joe" were uncertain at the time they acquired the rights. After their exploration of the possibility of independent motion-picture production proved fruitless, they crystallized their intention to sell the rights. This is a far cry from the situation which obtained in *Malat v. Riddell,* 383 U.S. 569 (1966), where the taxpayer's purposes both to rent and to sell were crystallized from the very beginning and the question was which of these two substantial purposes was "primary."

Admittedly, on the record before us, the question involved herein is not entirely free from doubt. But it seems to me that, in order to be entitled to the benefits of capital gains, petitioners ought to have furnished proof of "sanitization" of their claimed investment activities comparable to that required of a taxpayer who is a dealer in securities but also makes investments for his own account. Compare section 1236 and the regulations thereunder; *George R. Kemon,* 16 T.C. 1026 (1951). This, in my opinion, they have not done.

I would hold that petitioners held the motion-picture rights in "The Boy Friend" and "Stay Away Joe" primarily for sale to customers in the ordinary course of their business as theatrical producers or, alternatively, in the ordinary course of a business of selling motion-picture rights.[2]

DRENNEN, TIETJENS, RAUM, and SIMPSON, *J.J.,* agree with this dissenting opinion.

---

[2] While the Court stated in *Fred MacMurray,* 21 T.C. at 31 (1953), that "An actor or a producer-director does not in the ordinary course of his trade or business hold property primarily for sale to customers," it went on to point out that *"He may, however, engage in another business involving the purchase and sale for profit of property, such as stories for motion pictures."* (Emphasis added.)