CLARANEL JONES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jones v. Commissioner
Docket No. 7877-75.
United States Tax Court
T.C. Memo 1978-290; 1978 Tax Ct. Memo LEXIS 225; 37 T.C.M. (CCH) 1222; T.C.M. (RIA) 78290; July 27, 1978, Filed Sherry F. McCullough, for the petitioner. George W. McDonald, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined deficiencies in petitioner's Federal income tax for the following years in the following amounts: Year
Deficiency
1972
$ 3,469.00
1973
1,692.57
The sole issue for our determination is whether petitioner is entitled to deductions under section 212(2)[1] for expenses incurred in connection with a yacht owned by her during 1972 and 1973. The resolution *226 of this issue depends in turn on whether the yacht was primarily owned "for the production of income" as that phrase is used in section 212(2). FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner Claranel Jones resided in Marina del Rey, California, at the time the petition was filed in this case. Petitioner has for many years enjoyed boating and owned various boats. Between 1964 and 1972 she lived aboard sailboats at Marina del Rey, California, while employed as a flight attendant for United Airlines. She terminated this employment in 1972 and sought employment as a yacht salesperson. However, she encountered difficulties locating such employment and first began active employment in this field in 1974. On March 1, 1972, petitioner purchased a 42-foot cabin cruiser (hereafter referred to as the yacht) for a total cost (including the addition of various electronic equipment) of $ 80,853.97. From March 1972 until the present *227 petitioner has lived aboard the yacht. She also uses it approximately once every week for a pleasure cruise. The yacht requires relatively expensive and time-consuming maintenance on a continuous basis to prevent its deterioration due to the effects of salt water and direct sunlight. Before purchasing the yacht, petitioner consulted with Caryl Hinsby (hereafter referred to as Hinsby). Petitioner had first met Hinsby in 1962 while both of them were employed as flight attendants. Hinsby shared petitioner's enjoyment of boating, and possessed both the time (due to her work schedule as a stewardess) and the ability to perform most of the maintenance work on the yacht herself. They eventually agreed that Hinsby would live aboard the yacht and, in addition to paying rent, would perform maintenance duties on the yacht. She paid $ 150 per month rent in 1972, and $ 200 per month rent in 1973. These amounts were slightly greater than the "slip fee" paid by petitioner in connection with her use of the marina at which the yacht was docked. As tenant, Hinsby had one of the two bedrooms aboard the yacht, and shared use of the common areas of the boat, such as the kitchen and fly bridge, *228 with petitioner. As part of their agreement, she was also to receive an undetermined portion of the profit petitioner might receive if and when she sold the yacht. This entire agreement was oral, never reduced to writing, and the exact portion of profit she would receive was never specified. Essentially Hinsby treated the arrangement as the rental of a floating one bedroom apartment rather than as the rental of a boat. Petitioner considered using her yacht for pleasure cruise chartering in 1972, although this type of chartering had never been popular in the Marina del Rey area. Her yacht was not suited to use for deep sea fishing, which was popular in the area. During 1972 she made efforts toward obtaining a captain's license which she would need to pilot the yacht during chartered cruises. At this time, she discovered that legal restrictions on foreign built boats, such as her yacht, prohibited their charter except on a "bare boat" basis. This meant that petitioner could not charter her yacht while acting as master. Under a bare boat basis charter, the chartering party takes complete command of the vessel from the owner. Petitioner found this unacceptable because of the risk *229 to her property should inept or irresponsible persons operate it, and therefore did not charter the yacht. Petitioner had not obtained her captain's license as of the date of trial. Petitioner first listed the yacht for sale with brokers during May 1975. It had not been sold as of the date of trial. [2]
On her 1972 and 1973 Federal income tax returns, petitioner deducted $ 18,037.09 and $ 19,487.03, respectively, as expenses incurred in connection with rental property, less an allocation of 50 percent for owner occupancy. In the statutory notice of deficiency, respondent disallowed the expenses claimed in excess of the gross rent received, on the ground that the expenses failed *230 to qualify as deductible expenses. ULTIMATE FINDINGS OF FACT Petitioner's primary purpose in purchasing and owning the yacht during 1972 and 1973 was not for "the production of income" as that phrase is used in section 212(2). OPINION Petitioner purchased a yacht which she used as her principal place of residence during 1972 and 1973. She also rented a portion of the yacht to Hinsby as a residence during these years for amounts slightly in excess of the marina slip fees. Petitioner used the yacht for pleasure cruises but never engaged in charter activities. Petitioner seeks to deduct 50 percent of the expenses associated with this yacht under section 212(2) which allows individuals to deduct "all the ordinary and necessary expenses paid or incurred during the taxable year * * * for the management, conservation, or maintenance of property held for the production of income." Respondent challenges neither the amount of these expenses nor their "ordinary and necessary" character. The deductibility of the expenses in issue depends solely upon whether the yacht constitutes "property held for the production of income." Petitioner succinctly summarizes her position on reply *231 brief as follows: She purchased the boat * * * with a profit motive of holding it for capital appreciation and, at the time of purchase, she believed she could also charter the boat. The oral agreement of the lease with Ms. Hinsby was entered into merely to help maintain the [yacht] and keep it appreciating in value. Respondent argues that the yacht was primarily purchased for residential and recreational purposes, with the expectation of possible income due to its appreciation or charter constituting merely an incidental consideration. It is the primary purpose for which the property was held which determines the deductibility of related expenses under section 212(2). See section 1.212-1(c), Income Tax Regs.; Kanter v. United States, an unreported case ( E.D. Va. 1973, 31 A.F.T.R. 2d 73-973, 73-1U.S.T.C. par. 9311), affd. per curiam 489 F.2d 754 (4th Cir. 1974). Resolution of this question depends upon a consideration of all the facts and circumstances of the case, with no single factor given controlling weight. See *232 Section 1.212-1(c), Income Tax Regs.; Newcombe v. Commissioner,54 T.C. 1298 (1970); Rand v. Commissioner,34 T.C. 1146 (1960). Thus, the question requires an essentially factual determination. Carkhuff v. Commissioner,425 F.2d 1400 (6th Cir. 1970) affg. a Memorandum Opinion of this Court; American Properties, Inc. v. Commissioner,262 F.2d 150 (9th Cir. 1958), affg. 28 T.C. 1100 (1957). The burden of proving her contention remains with petitioner in this case. Carkhuff v. Commissioner,supra;International Trading Co. v. Commissioner,275 F.2d 578 (7th Cir. 1966), affg. a Memorandum Opinion of this Court. After listening closely to the testimony and considering it together with the stipulations and exhibits presented, we conclude that the yacht was not held primarily for the production of income in either 1972 or 1973. Although we reach this conclusion based upon a consideration of the entire record, five main factors, no one in itself controlling, compel our conclusion. First, the yacht constituted petitioner's principal *233 place of residence for the years in issue. The use of property as one's personal residence is trongly indicative of a personal rather than income seeking motive. See section 1.262-1(b)(2), (3), (4), Income Tax Regs. Moreover, her expenses in connection with this residence clearly fall within the ambit of section 1.212-1(h), Income Tax Regs., which states that: Ordinary and necessary expenses paid or incurred in connection with the management, conservation, or maintenance of property held for use as a residence by the taxpayer are not deductible. Petitioner requests us to ignore this factor, arguing that her residence aboard the yacht was necessitated by the size of her investment, and that she always intended to eventually sell it for a profit. However, we cannot accept her reasoning. It appears clear from both her testimony and her prior practice of living aboard boats at Marina del Rey, that she intended to live aboard the yacht. She has presented no basis upon which to distinguish her position from that of other taxpayers who invest much of their financial resources in a land-bound home with the hope of eventually reaping a profit upon its sale. *234 Secondly, the gain which petitioner alleges she sought constitutes merely the appreciation in value of the yacht occurring while she used it as her personal residence. "Clearly, where the profit represents only the appreciation which took place during the period of occupancy as a personal residence, it cannot be said that the property was 'held for the production of income.'" Newcombe v. Commissioner,supra at 1302. Accord Quinn v. Commissioner,65 T.C. 523 (1975), appeal dismissed (9th Cir. 1977); Kanter v. United States,supra.
A third factor is the circumstances surrounding the yacht's purchase which indicate the incidental nature of petitioner's intention of chartering it. She admitted that a substantial portion of her economic resources were committed to the yacht purchase, yet she failed to investigate the legal requirements and restrictions on charter activities prior to actually making the purchase. Further, there is no evidence that she engaged in any preliminary investigation of the economic feasibility of pleasure chartering, *235 aside from discussions with Hinsby. This is especially significant in light of the small market for pleasure cruises then existing at Marina del Rey. In contrast to this lack of investigation, "one who purchases an investment property would be expected to conduct a prepurchase investigation in a business-like way to ascertain its profit-making potential and to uncover any possible obstacles * * *." Monfore v. United States,     Ct. Cl.    ,    , F.2d    ,    , (1977). We also note in connection with this factor, that petitioner completely abandoned the idea of chartering the yacht upon learning that the yacht was legally limited to bare boat charters only, because of the danger to the yacht should it be handled by inept or irresponsible persons. There is no evidence that petitioner investigated the possibility of commercial alternatives such as an agreement with an experienced captain she could trust to pilot the yacht when chartered, or insurance to protect against damage caused by chartering parties. Read as a whole, the evidence indicates that petitioner did not *236 expect charter activities to constitute a significant source of income. Certainly she did not intend to enter the pleasure cruise charter business on a full time basis since she sought employment as a boat salesperson, and she intended to defer chartering activities entirely at least until she could obtain a pilot's license (which she still did not possess as of the date of trial). Even if she had begun chartering the yacht, such charters would have to have been limited to times convenient in light of her and Hinsby's personal use of the yacht as a residence. We conclude that petitioner intended the charter activities as merely an incidental revenue raising device to defray the yacht's expenses. This is not the same as having a profit motive. Martin v. Commissioner,50 T.C. 341 (1968); Rand v. Commissioner, 34 T.C. 1146 (1960). [3]
Another factor we have previously noted as relevant in this context is "the recreational character of the property." Newcombe v. Commissioner,54 T.C. 1298, 1300 (1970). *237 Yachts are frequently owned for personal, recreational purposes, [4] and the record proves this to be one of the primary, if not the primary motive for petitioner's yacht ownership. She had always enjoyed boats and boating, she had owned several boats previously, she had chosen to live aboard ships for several years prior to 1972, and she used the yacht in question for weekly pleasure trips. [5] This frequent use of the yacht for recreational purposes is strongly indicative of a personal rather than income oriented ownership. A fifth relevant *238 factor is the circumstances surrounding the rental agreement with Hinsby. While evidence of rental activity normally constitutes evidence of an income oriented ownership, the amount of rent received, the maintenance work performed by Hinsby, and the agreement with respect to the sharing of future yacht sale profits, provide evidence that the only function served by the rental agreement was to make her yacht ownership more economically viable. Further, the rental to Hinsby apparently did not significantly detract from petitioner's personal use and enjoyment of her yacht residence. Incidental rental of property used predominantly for personal reasons (such as residential and recreational purposes), which does not significantly detract from such personal enjoyment, does not constitute the holding of property for production of income. See Monfore v. United States,     Ct. Cl.    ,     F.2d     (1977); Carkhuff v. Commissioner,425 F.2d 1400 (6th Cir. 1970), affg. a Memorandum Opinion of this Court; Kanter v. United States, an unreported case ( E.D. Va. 1973, 31 A.F.T.R. 2d 73-973, 73-1U.S.T.C. par. 9311), *239 affd. per curiam 489 F.2d 754 (4th Cir. 1974). We conclude on the basis of the entire record that petitioner did not purchase or hold her yacht primarily "for the production of income" as that phrase is used in section 212(2). Nevertheless, petitioner contests our conclusion, principally upon the ground that she purchased the yacht intending to sell it later at a profit, and, therefore, expenses in maintaining it were deductible under section 1.212-1(b), Income Tax Regs., notwithstanding the lack of current income. However, most "people who buy property for residential purposes" are similarly "interested in making potentially profitable purchases." Austin v. Commissioner,298 F.2d 583, 584 (2d Cir. 1962), affg. 35 T.C. 221 (1960). Yet expenses incurred in connection with one's personal residence are clearly not deductible.[6]Sections 1.212-1(h), 1.262-1(b), Income Tax Regs. Petitioner's yacht was her personal residence, as well as a means of enjoying recreational cruises. We remain convinced that petitioner's primary motivation for its purchase and retention during the years in issue was her desire to satisfy both her housing needs and her recreational attraction to boats.
Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, unless otherwise noted.↩
2. On reply brief, petitioner states that the yacht was held for sale by her before being listed for sale. She also states that offers have been received and describes various events transpiring subsequent to trial. Whatever significance these happenings may or may not have to the questions in issue, there is no admissible evidence in the record to support any of these statements. "[Statements] in briefs * * * do not constitute evidence." Rule 143(b), Tax Court Rules of Practice and Procedure.↩
3. See also Lyon v. Commissioner,T.C. Memo 1977-239↩.
4. Martin v. Commissioner,50 T.C. 341 (1968); Rand v. Commissioner,34 T.C. 1146 (1960); Lyon v. Commissioner,supra. See also Morgan v. Commissioner,T.C. Memo. 1978-116; Carter v. Commissioner,T.C. Memo. 1978-202↩. 5. Petitioner states on reply brief that such trips were used by her as a boat salesperson to sell boats to potential customers. However, there is no evidence as to the extent of such business use, and, to the contrary, petitioner testified to beginning employment as a boat salesperson in 1974, after the years in issue in our case.↩
6. As we recently said in Eisenstein v. Commissioner,T.C. Memo 1978-95: "[If] the mere anticipation of eventually selling at a profit were in itself sufficient to establish that the property was held primarily↩ for a profit, most individuals who purchased a home or condominium several years ago could make that claim. Yet we do not allow those individuals to take such deductions, and Congress did not intend otherwise." [Emphasis in original.]